776 S.W.2d 96 (1988)
In re Kathy DRINNON and Jason Drinnon.
Gary and Mary KILPATRICK and Gary and Brenda Oliver, Plaintiffs/Appellees,
v.
Loretta Drinnon BROWN, Defendant/Appellant.
Court of Appeals of Tennessee, Eastern Section.
December 30, 1988.
Rehearing Denied January 30, 1989.
Certiorari Denied May 8, 1989.
D. Clifton Barnes, Johnson City, for defendant-appellant.
James N. Point, Rogersville, for plaintiffs-appellees.
*97 Charles W. Burson, Atty. Gen. & Reporter, and Dianne Stamey, Asst. Atty. Gen., Nashville, for Tennessee Dept. of Human Services.
Certiorari Denied by Supreme Court May 8, 1989.

OPINION
ANDERSON, Judge.
Mother appeals Chancellor's judgment terminating her parental rights.
Kathy and Jason Drinnon were removed from the custody of their natural parents, Loretta Drinnon Brown and William Edward Drinnon, on April 11, 1984, because of a finding by the Hawkins County Juvenile Court that the children were "dependent and neglected." Kathy Drinnon was placed by the Department of Human Services ("DHS") with Gary and Mary Kilpatrick, foster parents, and Jason Drinnon was placed with foster parents, Gary and Brenda Oliver. A foster care plan was then adopted, whose purpose was to remedy the conditions causing the removal and whose goal was to return the children to the mother.
Shortly after a decision by DHS, in April of 1986, to return the children to the mother, each set of foster parents filed a petition in Chancery Court to adopt Kathy and Jason Drinnon and a petition to terminate parental rights in the Juvenile Court. The petitions to terminate parental rights were based on Tenn. Code Ann. § 37-1-147(d), upon the theories of abandonment set forth in Tenn. Code Ann. § 37-1-147 and the mother's noncompliance with the foster care plan as required by Tenn. Code Ann. § 37-2-401.
The mother filed a motion to dismiss the termination petitions based on the foster care contract provision that the foster parents would not adopt the children. The Juvenile Court overruled the motion and, after a hearing in December of 1986, terminated parental rights.[1] The mother appealed.
The Chancery Court adoption and the Juvenile Court appeal were consolidated for trial by the Chancellor. After a hearing in February, 1988, the Chancellor terminated parental rights and transferred custody of Kathy and Jason Drinnon from DHS to the respective foster parents for "an indefinite period of time." The adoption petitions were reserved pending appeal. The mother appealed. We reverse.
It is well settled that parents have a fundamental right to the care, custody, and control of their children. Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute. Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).
The standard of review of a trial court's decision terminating parental rights is de novo upon the record with the presumption of correctness of the findings of fact by the trial court. Tenn. Dept. of Human Services v. Riley, 689 S.W.2d 164 (Tenn. Ct. App. 1984). The Chancellor found there was clear and convincing evidence to terminate parental rights pursuant to Tenn. Code Ann. § 37-1-147(d), which provides:
(d) After hearing evidence on a termination petition, the court may terminate parental rights if it finds on the basis of clear and convincing evidence that termination is in the child's best interest and that one or more of the following conditions exist:
(1) The child has been removed from the custody of the parent by the court for at least one (1) year and the court finds that:
(A) The conditions which led to the removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's return to the care of the parent(s) still persists;
(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be *98 returned to the parent in the near future; and
(C) The continuation of the legal parent and child relationship greatly diminishes the child's chances of early integration into a stable and permanent home.
....
(e) In determining whether there is likelihood that the child can be returned to the parent in the near future and whether termination of parental rights is in the best interests of the child, the court shall consider, but is not limited to, the following:
(1) Whether the parent has made such an adjustment of circumstances, conduct or conditions as to make it in the child's best interests to return home in the foreseeable future;
(2) Whether the parent has failed to effect a lasting adjustment after reasonable efforts by available social agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether there is brutality, abuse or neglect toward other children in the family;
(4) Whether there is such use of alcohol or controlled substances as may render the parent consistently unable to care for the child;
(5) Whether the parent has paid a reasonable portion of substitute physical care and maintenance when financially able to do so;
(6) Whether the parent has maintained regular visitation or other contact with the child which was designed and implemented in a plan to reunite the child with the parent.
Tenn. Code Ann. § 37-1-147(d)(1), (e) (1984 and Supp. 1988).
When Judy Drinnon (age 8), Kathy Drinnon (age 4), and Jason Drinnon (age 2), were removed from their mother in April, 1984, by the Juvenile Court, they were living in squalor. Both animals and children disposed of bodily waste when and where they pleased. Personal hygiene was unknown. There was no water in the home, nor toilet facilities. Loretta Drinnon's husband had left home and she had no income. Her only source of help was the sporadic charity of the Victory Baptist Church. Her mother had deserted her as an infant. Because she had been raised in deprived circumstances by an elderly father and brothers, she had not learned basic housekeeping or cleanliness. The Department of Human Services placed all three children in its foster care program and adopted a foster care plan.
In order to comply with the requirements of the foster care plan, the mother moved to a new home with three bedrooms; she remarried and obtained income that, while limited, was adequate to support the children. Although she is mentally limited, she has obtained assistance and training to learn how to count money and make change. She has continued to attend adult education classes; receives homemaker services; has learned how to properly cook and clean; and has more knowledge as to training and discipline of the children. She has always been interested in the children and has visited regularly. Although the mother's progress was gradual, she made sufficient improvement that DHS returned Judy, the oldest child, to her. As of April of 1986, she had substantially complied with the foster care plan in the opinion of DHS.
The Chancellor himself found:
The mother herself has made remarkable progress. At the time the children were removed, her speech was barely intelligible. She now speaks rather well compared to her former speaking ability. She has also made some progress with regard to her homemaking skills; apparently there is no filth or clutter as before. In short, the mother has tried very hard to comply with the foster care plan promulgated by the Department of Human Services. She has done the best she can do under the circumstances and taking into account her mental limitations.
....
[T]he mother loves her children dearly and within her limitations has done all *99 that she can do to insure their return to her.
Pauline Rogers, a homemaker for DHS who worked with the mother for three and one-half years, said that she has made great progress as a housekeeper  "keeps her house well and it is clean"; can prepare basic meals; has improved her personality and her personal appearance; and is doing a good job disciplining Judy. She also testified:
She always listened to everything I told her or suggested that she do. I think she did that for the Department of Human Services, she tried everything they ever suggested that she do.
....
She's always planning for [the children's] return, like buying clothes and fixing the bedrooms for them and things.
Blevins Charles, her DHS case worker, worked with her for two years on the foster care plan, until February of 1986. In her opinion, the mother was capable of disciplining the children, caring for them, motivating them to go to school and learn, but she could not help them in their studies. She testified:
Q: Did you tell her that if she did everything you asked her to do that she would get her children back one day?
A: That was the whole purpose, yes. I am sure I did because I thought she would.
Q: Within her ability, she did everything you asked her to do?
A: Yes, she did.
Because of the mother's improvement, Blevins Charles recommended the children be returned to her.
Pam Mayo, the DHS case worker who worked with the foster parents and the children, had a different opinion. She recommended a longer period of visitation before attempting a return of the children to the mother. She had concerns about the mother's progress in parenting skills and discipline, and testified she did not think Ms. Drinnon had the necessary skills to have all three children in her custody full time. She further testified:
Q: Mrs. Brown's circumstances have improved tremendously since these children were removed from her, haven't they?
A: Yes, they have.
Q: With respect to the list of things in the foster care plan, she has improved in almost all of those areas, has she not?
A: Yes, she has.
Q: She has continued to cooperate with you and she is now attending some adult education classes and you are aware of that?
A: Yes.
DHS evaluated the case, considered the Mayo dissent, and, based on the overall improvement and compliance with the foster care plan, decided to first expand the visitation and then return the remaining children  Kathy and Jason  to the natural mother. Before DHS could carry out the plan, the foster parents filed petitions in Juvenile Court to terminate parental rights and in Chancery Court to adopt the children.
The foster parents are obviously sincere and well intended, but their actions reflect the drawbacks of the foster care system. The record shows that when these children were placed with foster parents, the foster parents had little or no experience in the performance of the emotional balancing act required of foster parents in being able to give up foster children at the time required. The foster parents entered into a contract with DHS requiring that no effort be made at adoption. Despite the contract, after a year DHS discussed the possibility of adoption with them. When faced with the decision that DHS was going to return these children to their mother, the foster parents assumed the role of adversaries and successfully resisted the efforts of DHS and the natural mother to return the children to her home.
The Chancellor expressed the dilemma eloquently:
The primary goal of any foster care program is to maintain the family unit and re-establish (or create) familial relationships. In other words, the ultimate goal must be the return of the children to the *100 parents. The ever-present danger in a foster care situation is the intense bond and affection that can be  and probably will be  created between the foster parents and the child... . The foster parents must walk an exceedingly fine line. They must give love, but not so much that the bond cannot be broken without severe trauma to the child. If the foster parents allow themselves to become so attached to the child that they seek permanent custody or adoption, then the foster care program itself is in peril and an invaluable tool could be rendered useless.
The Chancellor based his final decision on the relative merits of the parents, stating that the mother cannot supply the extraordinary needs of the children. The Chancellor concedes it is not a willful failing on her part; it is simply a matter of mental ability. He finds the children need a stable environment with a lot of encouragement and discipline.
The mother argues that the evidence is not clear and convincing that she would not be able to adequately provide for the psychological maturation and physical safety of the children. While she will need the assistance of a homemaker and special education classes for the children, she argues that she will be able to care for her children.
That the foster parents' have a home, which can offer more in terms of material things, and quality of life is undisputed. That they are also intelligent and can aid the children in school is evident. But those advantages are not the question, nor is custody the question. The issue is much more permanent: It's whether you sever the blood relationship  the symbolic umbilical cord between mother and child. It's whether Loretta Drinnon will ever suffer the pain and pleasure of being a mother again to these children.
Judges may exercise the power of the state to cut the parental bond and terminate parental rights only if there is clear and convincing evidence the action is in the child's best interest and the conditions which led to the removal still persist and will not be cured at an early date. We have examined the voluminous record in this case with care and find that there is not clear and convincing evidence under the statute justifying termination of parental rights. We also find custody of the children should be returned to DHS from the foster parents. Because of this finding, we pretermit the issues of willful conduct and the foster care contract.
Accordingly, we reverse the Chancellor's judgment and remand. Costs of the cause are taxed one-half to the Appellees Kilpatrick and one-half to the Appellees Oliver.
SANDERS, P.J. (E.S.), and GODDARD, J., concur.

ORDER ON PETITION TO REHEAR
Appellees Kilpatrick and Oliver have filed a Petition to Rehear the issue of custody of the minor children, Kathy and Jason Drinnon. We found in our Opinion that "custody of the children should be returned to the Department of Human Services from the foster parents." Implicit in that finding was that the best interest of the children would be served by the Department of Human Services retaining custody and full power to act under the law with respect to the children. Appellees' Petition to Rehear is respectfully denied.
 s/ E. Riley Anderson
 E. Riley Anderson, J.
 s/ Clifford E. Sanders
 Clifford E. Sanders, P.J.
 [E.S.]
 s/ Houston M. Goddard
 Houston M. Goddard, J.
NOTES
[1] The natural father did not appeal the Juvenile Court decision terminating his parental rights.