IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 5, 2004

## STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES v. BARBARA MICHELLE DAVIDSON, ET AL.

Appeal from the Juvenile Court for White County
No. JU-1501      Sammie E. Benningfield, Jr., Judge

No. M2003-02601-COA-R3-PT - Filed February 2, 2004

The Juvenile Court of White County terminated the parental rights of the natural parents of two young girls. The Father suffered judgment by default and did not appeal. Parental rights of the Mother were terminated after trial on the merits and she appeals. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, and FRANK G. CLEMENT, JR., JJ., joined.

Robert Steven Randolph, Cookeville, Tennessee, for the appellant, Barbara Michelle Davidson.

Eddie Davidson, Lakeside, Michigan, Pro Se.

Sharon Patricia Data, Guardian Ad Litem, Sparta, Tennessee, Pro Se.

Paul G. Summers, Attorney General & Reporter; Juan G. Villasenor, Assistant Attorney General; Anne Austin, Cookeville, Tennessee, for the appellee, Tennessee Department of Children's Services.

### OPINION

The minor child, A.T.D., was born to Barbara Michelle Davidson and Eddie Gene Davidson on April 12, 1996, prior to their marriage. The minor child, L.N.D., was born to them April 28, 1998, subsequent to their marriage. Eddie Gene Davidson does not contest termination of his parental rights and has not appealed. Barbara Michelle Davidson does not seriously contest grounds for termination of her parental rights but focuses her appeal instead upon the finding of the trial court that termination of her parental rights was in the best interest of the minor children. Careful review

of the record indicates that she has no substantial basis for contesting the finding of the trial court that grounds for termination of her parental rights were established by clear and convincing evidence.

The conditions that brought about the removal of the children from the custody of Michelle Davidson and their placement in the custody of DCS are best described in the Protective Custody Order entered on the date of such removal, January 22, 2002.

It appearing to the Court from the sworn allegations of the Petition filed in the above-styled matter that there is probable cause to believe that the above-named are dependent and neglected children in that the mother of the above-named children, Michelle Davidson, was charged with Reckless Endangerment, Possession of Schedule II drugs and Criminal Intent to Manufacture methamphetamines. The officers found items consistent with the manufacture of methamphetamine in the home where the said minor children were residing with their mother and Mr. Brent Tolbert, a convicted felon. The Department originally went out to the home in the process of completing an investigation on a referral received by the DCS alleging that the said minor children were often left unsupervised while their mother, Ms. Davidson slept throughout the day and that the children were sent outside to collect paper to burn for heat and that the home was without electricity. In addition, the allegations included concern that Ms. Davidson was using illegal drugs. The DCS requested an officer escort in an effort to ensure the Case Manager's safety and went out to visit the home. DCS determined upon entering the home that there was electricity, but a lack of plumbing. Ms. Davidson did admit to smoking meth two days prior with some friends. The Case Manager observed several mason jars in the cabinets and received inconsistent answers as to the reason and purpose for the jars. The Case Manager also observed a mason jar, half-full of acetone, which Ms. Davidson stated was used to clean paint off of the brushes. There was an additional, smaller jar that also contained acetone, Ms. Davidson stated that the smaller jar made the acetone easier to pour. The Case Manager also observed a bottle of butane in the living room and several batteries that looked like car batteries throughout the house. Of further concern, were the guns in the home, one loaded and possibly 15 accessible to the children. The DCS, after completing the inspection of the home prepared a voluntary plan of action with Ms. Davidson; however, the officers later obtained a search warrant and after completing their investigation of the home, charged with Ms. Davidson as mentioned above. (sic) Ms. Davidson was placed in jail on a $30,000 bond and the children have been taken into the custody of the DCS and placed with relatives pending the Preliminary Hearing. The father of the above-named children, Eddie Davidson, was contacted regarding the removal of the children, but he stated that he would be unable to take custody of the children and that he had approximately 23 days in jail that he needed to serve. That the above-named children are subjected to an immediate threat to the children's health and safety to the extent that delay for a hearing would be likely to result in severe or irreparable harm and there is no less drastic alternative to removal available which

could reasonably and adequately protect the child's health and safety pending a preliminary hearing; that it is contrary to [L.'s] welfare at this time to remain in the care, custody, or control of her parent due to her mother being currently incarcerated on charges of Reckless endangerment, possession of Schedule II drugs, and Criminal Intent to Manufacture Methamphetamine. In addition, Ms. Davidson admitted to smoking meth two days prior to the DCS investigation. There were components commonly associated with the manufacture of methamphetamine found in the home where the said minor child lives with her mother and therefore a concern that there may have been a meth lab in the home which can be explosive and toxic, endangering the child. It is also contrary to [A.D.'s] welfare at this time to remain in the care, custody, or control of her parent due to [reasons identical to those listed above for [L.D.]. It is contrary to the welfare of [A.] and [L.] to be placed in the custody of their father because he is without a permanent home and states that he cannot care for the children. The lack of continued reasonable efforts in the above-styled matter is reasonable due to the mother currently being incarcerated and also being charged with the charges listed above and the components commonly associated with the manufacture of meth being found in the home, as well as Ms. Davidson's admitted meth usage and the father's inability and/or lack of desire to care for his children.

These dangerous conditions undisputed by the Mother, and the association with the felon, Brent Tolbert, led to the children's removal and the eventual termination of her parental rights.

PERMANENCY PLANS

The first Permanency Plan, entered into on February 11, 2002, was an ambitious one with the permanency goal being to return the children to their Mother. This first Permanency Plan observed that "Mrs. Davidson appears to love her children and want what is best for them." It further appeared that Mrs. Davidson was in good physical health, appeared to bond with the children, and that the children bonded with each other and were likewise in good physical health. The desired outcome was "Mrs. Davidson will successfully complete A & D treatment and will refrain from using illegal drugs. Mrs. Davidson will not associate with others who use illegal drugs. Mrs. Davidson will have random drug screenings." The expected achievement date under this plan was July 19, 2002.

On April 18, 2002, both Mother and Father attended the first review of the Permanency Plan. While the permanency goal of returning the children to their home remained the goal of the plan, it was found that the children needed to remain in foster care, and that, while the children had completed all tasks assigned to them in the Permanency Plan, no task assigned to the Mother had been completed and that their progress was marginal. The periodic review summary listed the following as barriers to achieving the desired outcomes of the [L.D.'s] parenting plan: problems noted were "Mother's pending criminal charges, lack of housing, employment - has not completed

parenting classes." It was further observed that both Mr. and Mrs. Davidson needed to make "drastic strides for their children." The next review date was set for October 18, 2002.

Much happened between the original Permanency Plan of February 11, 2002 and January 13, 2003 where a revised parenting plan was adopted. While the record indicates persistent and near exhaustive efforts by DCS to assist Mrs. Davidson, her record indicates continued drug abuse, apparently successful efforts to defeat drug testing by a process of consuming large quantities of water prior to the test, continuing deception as to her chronic use of methamphetamine, and continued association with drug users including the very person involved with her in the methamphetamine operation in the first place. Her continued drug use resulted in revocation of her probation, and she was returned to jail on July 16, 2002 and remained there until March 19, 2003.

On January 13, 2003, the revised Permanency Plan was adopted with dual goals of returning the children to the parent and alternatively adoption. The reason for the change in permanency goal was lack of compliance by the parent with the first Permanency Plan. On February 26, 2003, DCS filed a Petition to terminate the parental rights of both the Father and the Mother on the basis of abandonment, nonsupport, and failure to comply with Permanency Plan.

The termination hearing was held May 13, 2003, with case worker Jennifer Forrester testifying in conformity with her final Quarterly Progress Report of April 17, 2003, wherein she observed:

> Ms. Davidson was released from the White County Jail on 3/19/2003. Ms. Davidson obtained an alcohol and drug assessment on 3/31/03, and it was recommended that she attend intensive outpatient treatment for 8 weeks. Ms. Davidson was supposed to begin these classes on 4/1/03, however, she stated that her car had burned. On 4/12/03, Ms. Davidson stated that she would begin her alcohol and drug treatment program at the Wellness Center in Livingston, and that she had found a ride to the classes. Ms. Davidson completed a parenting assessment while she was incarcerated, and she is receiving parenting classes in her home at this time. Ms. Davidson is living with her sister in law in Livingston. Ms. Davidson needs to complete her alcohol and drug treatment. Ms. Davidson needs to obtain employment. Ms. Davidson has continued to associate with persons known for drug use, despite the requirement on her permanency plan that she not associate with persons convicted of drug offenses or known drug users.

At the hearing of May 13, 2003, after 16 months of on-going deception, Ms. Davidson testified:

> Q.    Mrs. Davidson, if I understand your testimony, you are saying that prior to the removal of your children and up through your incarceration in July of 2002 that you were using up to a gram of methamphetamine every day?
> A.    Yes, ma'am.

Q.      And you got the methamphetamine from Brent Tolbert?

A.      I would rather not answer that.

Q.      I would ask the Court to order her to answer.

THE COURT:  Answer the question.

A.      Yes, ma'am.

MR. AUSTIN:   Brent Tolbert actually cooked and what I would call manufacture methamphetamine.  Correct?

A.      Yes, ma'am.

Q.      Just prior and on January 22nd . . . Well, actually I think it was the 19th that they were actually placed in foster care, but in January of 2002 when the children were placed in foster care, the children and you were in the home with him while he was manufacturing methamphetamine, weren't you?

A.      No.  My kids stayed at my father's most of the time and I would take them with me every now and then.

Q.      You took them to the home where he cooked meth?  Right?

A.      Every now and then, yes.

Q.      Well, basically you didn't do anything to comply with the permanency plan in February or the first of March.  It wasn't until April that you started doing anything.  Isn't that correct?

A.      Yes, ma'am.

Q.      You went for an A & D assessment in April of 2002, didn't you?

A.      Yes, ma'am.

Q.      And you told the person who did the assessment that you had only used methamphetamine one (1) time.  Isn't that correct?

A.      Yes, ma'am.

Q.      And because you lied to her, you were scheduled for low intensity out patient treatment.  Isn't that correct?

A.      Yes, ma'am.

Q.      And you didn't complete that treatment, did you?

A.      No.

Q.      You were using the whole time you were in that treatment, weren't you?

A.      Yes, ma'am.

Q.      You were passing all the drug screens that entire time up until June and July of 2002.  Isn't that correct?

A.      Yes, ma'am.

Q.      Did you use something to pass those drug screens while you were using?

A.      No.  I just drank a lot of water.

Q.      But you figured out a way that you could beat the urine drug screens and it wouldn't show that you were using meth when you actually were using it. Correct?

A.      Yes, ma'am.

Q. Since you were released from jail on March 19, 2003, you have admitted to Ms. Forrester taking a Hydrocodone pill that was not prescribed to you. Correct?

A. Yes, ma'am.

Q. And you know that is illegal, don't you?

A. Yes, ma'am.

Q. And you know that that is an abuse of an addictive drug, don't you?

A. Yes, ma'am. I had a bad toothache.

Q. That happened in March of 2003. Correct?

A. Yes, ma'am.

Q. So, when you testified earlier that the last time you had used an illegal drug was August 29, 2002, that is not correct. The last time was March of 2003. Correct?

A. Yes, since you put it that way.

Q. Your ex sister-in-law Mrs. White, they have a small home, don't they?

A. Three (3) bedrooms.

Q. Three (3) bedrooms. They have four (4) kids. Correct?

A. Five (5).

Q. Five (5) kids who live there in the home with them?

A. Two (2) of them goes to their mother every other week.

Q. Okay. But there are five (5) kids living in that home and your ex sister-in-law and her husband. So, that is seven (7) people living in the home without you there. Correct?

A. Uh-huh.

Q. In just three (3) bedrooms?

A. They are building on. They have almost got it finished.

Q. Are they building on for you?

A. No.

Q. Because you don't plan to continue living there, do you?

A. No.

As for the Mother's continued association with known drug users and felons Mrs. Forrester testified without dispute:

Q. Since her release from jail in March of 2003, have you had conversations with her regarding people that she is associating with?

A. Yes, I have.

Q. Okay. Tell us about those conversations please.

A. When Mrs. Davidson was in jail, she stated that she had a pen pal who was also incarcerated in another county. I advised Mrs. Davidson that her permanency plan stated that she was not to associate with known drug users.

Q. Let me interrupt. Is this pen pal in Mrs. Davidson's opinion a drug user?

A.    Yes.

Q.    Okay.  Go ahead.

A.    When she was out of jail, she told me on a few occasions that she was seeing him and that he was coming by to visit her and that they were having conversations.  I advised her again that she was not to associate with known drug users, and she stated that they were just friends.  However, she was stating that he was taking her to meet his grandmother and he was driving her around on the weekends.

So it is that the record in this case shows, not by just clear and convincing evidence, but by evidence that is essentially undisputed that:

1.    The children were initially taken from Mrs. Davidson in a home without plumbing that was primarily dedicated to meth manufacture and use.

2.    Throughout the period affected by the first Permanency Plan, while Jennifer Forrester of DCS was doing everything reasonable to facilitate the Mother's visitation with the children, the mother continued to consume daily doses of methamphetamine and continued to deny such usage.

3.    Her continued use of drugs resulted in revocation of her probation and her return to jail.

4.    After her release from jail she continued her association with known drug users.

5.    Mrs. Davidson has paid nothing toward the support of the children since the time they were removed from her custody in January of 2002.

In its final order terminating the parental rights of Michelle Davidson, the trial court found that clear and convincing evidence had established:

Barbara Michelle Mabe Davidson has not contributed to the support of the children since children were placed in Petitioner's custody on January 22, 2001.  She has not support[ed] her children in any meaningful way.  During the times she was employed, she did not contribute any of the money she earned towards the support of her children.

Barbara Michelle Mabe Davidson was advised on February 14, 2002 and January 13, 2003 that willful failure to visit or willful failure to contribute to the support of the children was grounds for termination of parental rights.

. . . .

The Defendants Barbara Michelle Mabe Davidson and Eddie Gene Davidson have therefore abandoned [A.T.D.] and [L.N.D.] in that they have willfully failed to visit and/or willfully failed to contribute to the support or make reasonable payments towards the support of said children for more than four (4) consecutive months prior to the filing of this Petition or incarceration.

The children were removed [from] the parents, Barbara Michelle Mabe Davidson and Eddie Gene Davidson, as the result of a Petition filed in Juvenile Court

in which the children were found to be dependent and neglected as defined by T.C.A. 37-1-102 and the children were placed in DCS custody. This Court found at that time that the DCS made reasonable efforts to prevent removal of the children or the circumstances of the children's situation prevented reasonable efforts from being made prior to the children's removal. For a period of four (4) months following removal, DCS made reasonable efforts to assist the parents, Barbara Michelle Mabe Davidson and Eddie Gene Davidson to establish a suitable home for the children, but the parents made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the children to such a degree that it appears unlikely that Barbara Michelle Mabe Davidson or Eddie Gene Davidson will be able to provide a suitable home for the children at an early date. Therefore, the Defendants have abandoned [A.T.D.] and [L.N.D.].

The Defendant, Barbara Michelle Mabe Davidson, has not substantially complied with the provisions of the permanency plans. Ms. Davidson is required to complete an A&D assessment and treatment, complete mental health counseling, complete parenting classes, submit to random drug screens and remain drug free, resolve criminal charges, and maintain stable income and housing with appropriate utilities. These requirements are reasonabl[y] related to remedying the conditions that necessitate foster care. Ms. Davidson made no attempt to comply with her permanency plan until April 2002, when she started A&D treatment and parenting classes, but did not complete them. In June of 2002 she had two drug screens that were positive for methamphetamines. She has not completed mental health counseling. She has not established stable income. Ms. Davidson's probation was violated due to her drug usage. She was incarcerated from July 15, 2002 through July 22, 2002. After she was released, Petitioner encouraged Ms. Davidson to complete her parenting classes and A&D treatment. Ms. Davidson has not completed them. Ms. Davidson did not visit regularly with her children during the month of August 2002. She claimed it was because she was working for her father. However she failed to provide proof of employment or income and when Petitioner made a daytime home visit, Ms. Davidson was not working, but rather was at home with her boyfriend. Ms. Davidson was again incarcerated on August 30, 2002. DCS made reasonable efforts to assist Ms. Davidson in complying with the permanency plan by referring Ms. Davidson to service providers, placing in home services in her home and by paying for portions of the services.

Barbara Michelle Mabe Davidson was advised on February 14, 2002 and January 13, 2003 that failure to comply with the permanency plans was grounds for termination of parental rights.

. . . .

The children have been removed from the custody of their parents for more than six (6) months.

-8-

The conditions which led to the removal of the children from the home of their parents still exist and other conditions exist which in all probability would cause the children to be subject to further abuse and/or neglect, making it unlikely that the children could be returned to either parent in the near future. After the removal of the children, Ms. Davidson continued to abuse methamphetamines, resulting in her being incarcerated. Had she complied with her rules of probation she would not have been incarcerated. She had not remedied any of the conditions that caused the children to come into foster care. Barbara Michelle Mabe Davidson had started A&D treatment several times, but has never completed A&D treatment. She admitted to taking hydrocodone, which was not prescribed for her, in March 2003. She continues to associate with drug users. She still does not have adequate living arrangements or the ability to support her children. Eddie Gene Davidson has abandoned the children. He has made no effort to provide the children a suitable home.

There is little likelihood that these conditions will be remedied at an early date so that the children can be returned to either parent in the near future.

The continuation of the parent or guardian and child relationship greatly diminishes the child's chance of an early integration into a stable and permanent home.

Barbara Michelle Mabe Davidson and Eddie Gene Davison have not made an adjustment of circumstances, conduct or conditions as to make it in the children's best interest to return home in the foreseeable future.

Barbara Michelle Mabe Davidson and Eddie Gene Davidson use of alcohol or controlled substances render them consistently unable to care for the children.

Barbara Michelle Mabe Davidson and Eddie Gene Davidson have not paid a reasonable portion of the children's substitute physical care and maintenance when financially able to do so.

Barbara Michelle Mabe Davidson and Eddie Gene Davidson have not paid child support consistently with the child support guidelines promulgated by the Department pursuant to T.C.A. 36-5-101.

We agree with the trial judge that all of these facts are established in the record by clear and convincing evidence.

THE BEST INTEREST OF THE CHILDREN

The primary thrust of the appeal by Michelle Davidson is that even if clear and convincing evidence establishes grounds for termination of her parental rights, the Court should not take such action because clear and convincing evidence does not establish that such termination is in the best interest of the children.

Tenn. Code Ann. § 36-1-113(i) describes the standard for determining whether termination is in the best interests of the child in such cases:

(I) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

While the record shows that visitation occurred between Michelle Davidson and the children with some degree of regularity, primarily through the efforts of DCS, and the record further establishes that the Mother loves her children and the children love her, none of the other criteria supports the position of the parent. The record and findings of the court specifically list every one of the statutorily listed criteria.

The state argues correctly, "The listed factors are not exhaustive. The statute does not require every factor to appear before a court can find that termination is in a child's best interest." *Tennessee Dep't of Children's Services v. T.S.W., et al.*, 2002 WL 970434 *3 (Tenn.Ct.App.2002).

The record fully supports the trial court determination by clear and convincing evidence that termination of the parental rights of Michelle Davidson is in the best interest of the children. We find the following discussion in accord:

> In making this best-interests determination, the trial court is required to consider, *inter alia*, [the statutory factors]:
>
> . . . .
>
> Tenn. Code Ann. § 36-1-113(i)(Supp.1998).
> In finding that termination of the Mother's parental rights was in the children's best interests, the trial court specifically considered factors (1), (2), (5), (7), and (9).
>
> . . . .
>
> We conclude that the evidence supports the trial courts' findings.

*In Re C.W.W.*, 37 S.W.3d 467, 475-77 (Tenn.Ct.App.2000)(affirming trial court's termination of parental rights despite parent's "significant" progress).

As in all termination of parental rights cases, court inquiry must be searching and diligent before a court is justified in terminating the fundamental right of natural parents to the care, custody and control of their children. *In re Drinnon*, 776 S.W.2d 96 (Tenn.Ct.App.1988). In this case the addiction of the Mother to methamphetamine required DCS to act to remove her children from deplorable conditions. She was afforded every opportunity to confront her problems while her children were being nurtured in foster care. She declined her opportunities and her own conduct returned her to incarceration. On each of the two occasions when she was released from incarceration she returned to the company of other persons involved in drugs. If her essentially unsupported claim is actually true, that following her last incarceration she has mended her ways, it is simply too little and too late. Every termination of parental rights case is a tightrope walk with the best interest of children and the fundamental right to care and custody of those children serving as balancing factors. When, as here, the parent has demonstrated such a complete lack of honesty in her own drug treatment as well as a complete inability to comply with parenting plans whose primary purpose was to reunite her with the children she would otherwise have a right to raise, the tightrope walk comes to a calamitous end. The trial court's determination, when supported by such clear and convincing evidence as here appears, that such reunification would fail to serve the best interest of the children should be, and is hereby, affirmed. The primary concern of the Court is, after all, the best interest of the children, not the best interest of the natural parent. Judgment of the trial court is in all respects affirmed and costs are assessed against Appellant.

_____
WILLIAM B. CAIN, JUDGE