**IN THE COURT OF APPEALS OF TENNESSEE, WESTERN SECTION**
**AT NASHVILLE**

_____

**FILED**

**March 6, 1998**

**Cecil W. Crowson**
**Appellate Court Clerk**

|  |  |  |
|---|---|---|
| **IN THE MATTER OF: JOEL KRISTEN SIPE**, | ) ) ) ) ) | |
| **STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES**, | ) ) ) ) | Davidson County Juvenile Court # 9519-20025 |
| Petitioner/Appellee. | ) ) | |
| VS. | ) ) | C.A. No. 01A01-9704-JV-00185 |
| **BRUCE SIPE and LAUREL SIPE**, | ) ) ) | |
| Respondents/Appellants. | ) ) | |

_____

From the Juvenile Court of Davidson County at Nashville.
**Honorable Andrew J. Shookhoff, Judge**

**Dennis L. Nordhoff**, Franklin, Tennessee
Attorney for Respondent/Appellant Bruce Sipe.
**Stacy L. Miller**, Nashville, Tennessee
Attorney for Respondent/Appellant Laurel Sipe.

**John Knox Walkup**, Attorney General & Reporter
**Douglas Earl Dimond**, Assistant Attorney General
Attorney for Petitioner/Appellee State of Tennessee Department of Children's Services

OPINION FILED:

**AFFIRMED AND REMANDED**

**FARMER, J.**

**CRAWFORD, P.J.,W.S.**: (Concurs)
**TOMLIN, Sr. J.**: (Concurs)

This is a termination of parental rights case. The minor child in question is Joel Kristen Sipe, born September 7, 1995 to Laurel Sipe ("Mother") and Bruce Sipe ("Father"). The trial court terminated the parental rights of both parents as to this child after finding on clear and convincing evidence that grounds existed to do so. Both parents have appealed. For the reasons expressed below, we affirm.

This case originated on the date of the child's birth when the appellee, State of Tennessee, Department of Children's Services (DCS or Department) filed a "Petition for Temporary Custody and Emergency Removal"[1] in the juvenile court, requesting that the child be immediately placed in its temporary care and custody pending a final adjudication regarding legal custody. The request was made on the allegation that the risk of physical harm to the child was "great" if allowed to remain in the custody of his parents. Specifically, the petition alleged a history of physical abuse by both parents; that their two other children were in DCS custody awaiting adoption because of "substantiated" physical abuse; and that Father had been diagnosed a paranoid schizophrenic. The petition was granted and Joel has remained in the custody of DCS since birth. A "Plan of Care" for Joel and his parents was initiated by DCS and approved by the court. The appellants received court appointed counsel.

Joel was placed in the foster home of Mr. and Mrs. Stanley Mitchell. According to a "Periodic Review Summary" maintained by the Department, dated March 26, 1996, its "goal" for Joel was "adoption." A progress report of the same date identifies the reason for termination as being "[b]ased on previous abuse to another sibling."

In July 1996, DCS filed an "amended petition" seeking to terminate the parental rights of Appellants on grounds that, *inter alia*, Father had previously committed severe child abuse against Joel's sibling in October 1994; that Mother, although not in the home at the time of the abuse, had consistently denied the "life threatening" nature of the abuse and continued in the marital relationship with Father; that Father's mental condition was so impaired and so likely to remain that it was unlikely that he would be able to assume care and responsibility for the child in the near

---

[1]The petition was originally filed under the Department's former name - Department of Human Services.

future; that Mother was unable to provide a safe environment for the child because of her continuation in the marital relationship, that Appellants had failed to adjust their circumstances so as to make it in the child's best interest to return to their home in the foreseeable future; and, finally, that Appellants had failed to pay any support toward the child's care and follow the plans of care outlined for them. The petition was once more amended in November 1996 to allege, as additional grounds, the appellants' willful abandonment of the child for more than four months preceding the filing of the petition and those grounds as identified under T.C.A. § 36-1-113(g)(3)(a).[2]

After a hearing,[3] the trial court terminated the parental rights of both parties, finding as follows:

> The proof in this case established by clear and convincing evidence grounds for termination pursuant to T.C.A. Section 36-1-113(g)(3). . . . In addition, the proof is clear and convincing that the parents substantially failed to comply with the Plans of Care.

> With respect to Mr. Sipe grounds for termination exist under T.C.A. Section 36-1-113(g)(4) in that Mr. Sipe has been found to have committed severe child abuse by Judge Cooke in the proceeding involving [Joel's sibling].

> Mr. Sipe has a long history of mental illness. He has failed to follow through with the treatment that is necessary to effectively manage his mental illness, allow him to maintain a stable life style and prevent episodes of aggressive and confrontive behaviors which have in the past resulted in criminal prosecution and placement in psychiatric facilities.

> Mr. Sipe's mental illness and the behaviors that are related to that are obstacles to his ability to safely parent a child. . . .

> Mr. Sipe's mental illness, the behaviors associated with that illness, his failure to follow through with treatment, and the fact that he had previously been found to have abused his daughter, provided the basis for removal of this child who is the subject to these proceedings. . . . Those conditions support a finding that the child is a neglected and dependent child, under T.C.A. § 37-1-102(b)(12)(B).

> . . . .

> Mrs. Sipe is extremely devoted to her husband and has in effect decided that she would rather not regain custody of her child if she and Mr. Sipe could not raise the child together.

> . . . .

---

[2]Section 36-1-113(g) will be discussed in more detail hereinafter.

[3]The hearing occurred on November 18 and 20 and December 2, 1996.

With respect to this child, Mrs. Sipe is so strongly attached to her husband that for most of the time the child has been in care, she would not even visit the child unless Mr. Sipe came along. If Mr. Sipe was not available to go to the visit with her, Mrs. Sipe would cancel the visit. Her deference to her husband has also prevented Mrs. Sipe from being able to be a support for him to follow through on his mental health treatment. If Mr. Sipe decides to stray from his treatment, Mrs. Sipe appears to support his decision to do so.

. . . .

The Sipes are at an impasse with respect to moving forward to addressing the obstacles to reunification. Because they have not been able to acknowledge the prior abuse and the mental health needs of Mr. Sipe, they are not able to make progress on recognizing and thus being able to diminish the risks to the child. Because they are unable to visit consistently, they have not developed the bonding necessary to allow them to assume parental responsibilities. The Court does not see any realistic prospects of them addressing these obstacles to reunification in the foreseeable future.

. . . . In reviewing and considering the statutory criteria relevant to the best interest determination, all those criteria support a finding that it is in the child's best interest to grant the petition.

. . . . The parental rights of Laurel Sipe and Bruce Sipe to their child, Joel Kristen Sipe, are hereby terminated.[4]

We perceive the issue on appeal as whether the trial court erred in terminating the parental rights of Bruce and Laurel Sipe as to their son, Joel. T.C.A. § 36-1-113(c) allows a trial court to terminate the parental rights of a parent upon a finding of "clear and convincing evidence that the grounds for termination . . . have been established;" and that termination is in the child's best interest. Our standard of review of the trial court's decision is *de novo* upon the record with a presumption of correctness of the trial court's findings of fact, unless a preponderance of the evidence is otherwise. *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. App. 1988); Rule 13(d) T.R.A.P.

Appellants argue that the proof before the trial judge failed to establish by clear and convincing evidence that there was a persistence of the conditions which led to Joel's removal to an extent as would subject the child to further neglect with little likelihood of remediation. To the

---

[4]Section 37-1-102(b)(12)(B) reads:

"Dependent and neglected child" means a child:
. . . .
(B) Whose parent, guardian or person with whom the child lives, by reason of cruelty, mental incapacity, immorality or depravity is unfit to properly care for such child;

contrary, they assert that the proof establishes a change of circumstances and improvement of their living conditions and an ability on their behalves to effectively parent their son. It is further contended that DCS did not make reasonable efforts to reunify the family, mainly because of Father's mental illness and the prior finding of abuse as to another sibling. In essence, it is argued that although the Sipes "did remedy their circumstances," (both now have stable housing and employment and Father is doing well without his medication) their rights were nonetheless terminated primarily because Father ceased his prescribed medications.

The record indicates that Father suffers from a bipolar disorder, or manic depression, for which he has been prescribed various medications. He was first diagnosed with the illness in 1992. He has also been diagnosed with an antisocial personality disorder and has a history of substance abuse. He has had numerous encounters with law enforcement and was placed on probation by order dated September 16, 1996 after a conviction for assault. The record is clear that Father committed severe child abuse against his daughter and that both parties' parental rights as to her, as well as their other son, were thereafter terminated. Nonetheless, the testimonies of both parties at trial indicate a strong denial that Father committed such abuse against his daughter. It was Father's testimony that there was no abuse against his daughter but that he "accidentally fell on her." Mother, too, did not believe her husband "purposely hurt [their daughter]."

T.C.A. § 36-1-113(g) lists various grounds upon which the termination of parental rights may be based. The fourth identifying ground is where "[t]he parent . . . has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights . . . to have committed severe child abuse against the child who is the subject of the petition or against any sibling . . . of such child, . . ." The record includes an order entered by the Davidson County Juvenile Court in September 1993 finding the parties' daughter "a dependent - neglected and severely physically abused child" as defined by statute. The order identifies Father as the "perpetrator" of the abuse.

We find the record to support the trial court's finding that grounds for termination as to Father's parental rights exist under § 36-1-113(g)(4). The trial court also noted additional grounds. We, likewise, find additional reason for the termination of Father's parental rights, upon

thorough review of the record, and note here our strong reservations regarding Father's ability to parent. We are cognizant of the fact that the Sipes, as of the hearing, have stable employment and housing. The record, however, reflects Father's continued difficulty in recognizing and accepting the serious nature of his mental illness. He denied at trial that he had a bipolar disorder in 1992, although he was diagnosed with such and even now states that he only has it "mildly." At the time of the hearing, he was not taking his prescribed medications for this illness; however, he did agree that he would benefit from counseling regarding certain personal issues such as self-esteem and being a better parent and "person in society in general." He was not seeing a counselor at the time of trial. He denied any current alcohol or illegal drug use. When specifically asked what he considered his present mental condition to be, he replied: "[t]hat I am a non-using alcoholic and a non-using drug addict. . . . And that I have some counseling issues." He believes he was misdiagnosed as having an antisocial personality disorder, and although he agrees that he has a bipolar disorder, he states that "there's a lot of people that have it that work fine." He stated that he would take medication for the latter, if there were no side effects.

Testimony was also presented that Father is currently "stable." However, he himself testified that another manic episode was probable, explaining that "as long as I can identify when I am getting manic or I am having difficulties and I put myself in situations that I can't get out of and I don't take the right procedures, like using drugs, . . . I'd get manic. If I use drugs I'd get manic. If I use alcohol I'd get manic. If I didn't get proper rest I will get manic. . . ." The record indicates that one manic episode in May 1994 resulted in the SWAT team being called to a friend's residence to subdue him after he had made certain threats toward his wife (apparently, to throw her out a window). This incident led to his admission into the Middle Tennessee Mental Health Institute.

Dr. Ira Rosenshein testified that he began treating Father in March 1995. He stated that Father complained to him of side effects from the medication or "from some medicines that he was receiving for medical problems. Other times, [Father] would say he just [didn't] believe that he was manic depressive and he just didn't want to take the medications . . . ." Rosenshein last treated Mr. Sipe on September 12, 1996. Rosenshein believes Father needs "monitoring of his mental status" to assure that he's not going to have a manic or depressive episode.

Rosenshein said there was only treatment for this particular illness, no cure. He proclaimed a recovery rate of 50 to 65% "from a manic episode" to stabilization if on one's prescribed medication. Rosenshein further testified that there were no medications currently being prescribed for the bipolar disorder that did not have some side effects. Rosenshein confirmed that a person with bipolar disorder would have some periods of normalcy even without their medication, but that there was no certainty as to how long the period would last, and that even a person taking the prescribed medication could likewise suffer a manic episode. In other words, the medication is no guarantee. Rosenshein stated that usually a "stressor" triggers the episode. Rosenshein also recommended that Father seek therapy for his antisocial personality disorder.

Ms. Lucinda Pinsence, a licensed psychological examiner, testified that she first treated Mr. Sipe in February 1996. According to her, the goals of therapy included addressing issues regarding Mr. Sipe's anger, his distrust for authority, his problems relating to others and his self-esteem. He was also to receive psychiatric monitoring. Pinsence stated that during treatment sessions, Father's behavior could be "very combative," and that "[s]ometimes he's very blunt in his statements . . . ." Pinsence has not treated Father since August 7 after he ceased coming to his sessions or scheduling appointments. Pinsence did not believe that Father had met the goals initially enumerated and that there were still "valid problems" concerning his social behavior skills and taking responsibility. Pinsence observed no assaultive behavior by Father, only "verbal hostility." She found Father more "cooperative" as their therapy sessions progressed. She said that Father had since contacted her regarding continuation of his therapy sessions and that she was agreeable in doing so. His reasons for missing appointments or failing to schedule them primarily concerned transportation difficulties.

Glenda Copeland, a social counselor with DCS, testified as to her observations of the Sipes during their visitation periods with Joel. She did not find Father's treatment of the child "age appropriate" (playing airplane and boxing when the child was six or seven months old). Father seemed more concerned with "confronting" her or a co-worker "on one issue or another" rather than playing with or holding the child. She found Mrs. Sipe's behavior "very passive." She did not observe a lot of holding, cuddling or kissing of the baby. She described Mrs. Sipe as "detached" from the child. She often observed Mrs. Sipe feed the baby. She does not believe Father capable

of properly caring for his son, based specifically on "[h]is behavior to changes. The fact that he gets angry and . . . has shown no loving or bonding with that child . . . ." Ms. Copeland also found Mrs. Sipe "very dependent" on Mr. Sipe and stated that Mrs. Sipe, when asked whether she knew that she could possibly get custody of Joel if she discontinued her relationship with Mr. Sipe, replied that she would "never jeopardize [her] marriage" and that her "marriage [came] first." Copeland stated that her primary concern regarding Mrs. Sipe having the child was a "[f]ailure to protect."

Ms. Lori Rhodes-Brown, the Department's primary counselor on this case, testified that the Sipes had not visited with Joel since July 1996. The trial court found that of the 64 weeks available to the Sipes to visit their child, Mrs. Sipe had done so on 23 occasions and Mr. Sipe, on 20. The record supports this finding. At least four or five of the scheduled visits were cancelled by the Department due to the child's poor health. As found by the trial court, the parents stated reasons for failing to visit were scheduling conflicts and Father's allergic reaction to the visitation area. The trial court did not find these reasons "persuasive." It is not disputed that the parents have failed to provide any child support since Joel was taken into custody.

As to Mrs. Sipe, there was testimony that she met all the requirements of her plan of care (albeit over a long period of time) except the one requiring her to know Mr. Sipe's prescribed medication and dosages and be aware of his compliance therewith, as well as his counseling. Ms. Brown testified that her primary concern regarding Mother's custody of the child is "that she would not be able to protect the child from Mr. Sipe should anything occur." One of the stated grounds for termination under § 36-1-113(g) is subsection (3)(A), which states as follows:

> (3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's return to the care of the parent(s) or guardian(s), still persist;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be returned to the parent(s) or guardian(s) in the near future; and
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a stable and permanent home.

We find the record to establish grounds for termination of Mrs. Sipe's parental rights based on those hereinabove identified. Clearly, this child has had to struggle from day one of its life. He was born prematurely with anemia and immediately placed on a feeding tube. He has since endured multiple ear and respiratory infections, including pneumonia. The record further indicates the possibility that he has sustained cerebral palsy. We concur in the following observation made by the trial court:

> The minor child has a number of medical problems which have required numerous doctor visits. The foster father testified that the child requires a great deal of care which he and his wife have provided, including transporting him to various appointments as well as taking care of him when he had to remain out of day care. At least some of the purported reasons for the parent[s'] failure to visit their child were conflicts with their schedules. If the parents cannot make arrangements in their personal lives and with their jobs to make a one to two hour weekly visit with the child, it is difficult to understand how they could adequately meet the child's needs should they have him in their home. . . . Nothing has been presented to show that circumstances have changed to allow them to do so at this time.

Although it appears from the record that the Sipes' housing and employment situations are currently stable and that Mr. Sipe is functioning well, without his medications, the record is clear that Mr. Sipe could experience another manic episode without warning, especially if off his medications. Based on the violent nature of these episodes and his violent tendencies, coupled with Mrs. Sipe's apparent unwillingness to protect her child from such behavior even if to the detriment of her own marriage, convinces this Court that there exists clear and convincing evidence on which to terminate the parental rights of both parties as to their son, Joel.

A case of this nature, involving the termination of parental rights of a natural parent is, indeed, one of the most difficult this Court is called upon to address. Our decisions in this regard must be driven by our paramount concern which is the best interest of the child(ren) involved. After a thorough review of the record in this case, our decision convinces us that those interests have prevailed.

The judgment of the trial court is affirmed and this cause remanded for any further necessary proceedings. Costs are assessed against the appellants, for which execution may issue if necessary.

_____
FARMER, J.


_____
CRAWFORD, P.J., W.S. (Concurs)


_____
TOMLIN, Sr. J. (Concurs)