IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 31, 2002

## IN THE MATTER OF: C.N.S. and C.J.S.

**Appeal from the Juvenile Court for Maury County**
**No. 15548     George L. Lovell, Judge**

---

**No. M2001-02544-COA-R3-JV - Filed September 17, 2002**

---

The trial court terminated the parental rights of the mother of two young children on multiple grounds, including the mother's inability to meet their special needs. The mother argued on appeal that the grounds for termination were not proven by clear and convincing evidence. We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed and Remanded**

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which WILLIAM C. KOCH, JR. and WILLIAM B. CAIN, JJ., joined.

Beverly Rayburn, Columbia, Tennessee, for the appellant, C.E.S.

Paul G. Summers, Attorney General and Reporter; Elizabeth C. Driver, Assistant Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.  DCS OBTAINS CUSTODY OF TWO CHILDREN

C.E.S. and her husband, D.S. are the parents of two girls,  C.N.S. and C.J.S., born in 1995 and 1997 respectively.  The Department of Children's Services (DCS) filed a petition for temporary custody of the children on January 22, 1999, after reports that the whole family was suffering from a severe infestation of head lice, and that the parents had failed to keep medical appointments necessary for the well-being of C.J.S., who suffers from cerebral palsy and a number of congenital abnormalities.

The trial court found the children to be dependent and neglected, and granted custody to DCS.  Shortly thereafter, DCS placed the children with a foster family, and prepared a permanency plan, setting out a number of goals for C.E.S. and D.S to accomplish in order to be reunited with

their children. The goals were to (1) secure employment to provide financially for the children, (2) secure adequate housing, (3) show the ability to provide medical treatment for the children, including attending medical appointments, (4) maintain a clean living environment for the children, (5) attend, participate in, and complete parenting classes, (6) attend and arrange counseling, and (7) maintain contact with the children.

Soon after the children came into foster care, C.N.S. revealed to her foster mother and to her therapist, Dr. William Vaughn, Ph.D., that she had been sexually abused by her father. Dr. Vaughn wrote a letter to DCS in which he detailed severely disturbed behavior that he had observed during interactive play therapy, and which had been reported to him as also occurring both at home and at school. This included explosive anger and daily acting out of aggressive sexual conduct towards both children and adults which we will not describe here. Dr. Vaughn also diagnosed C.N.S. with bipolar disorder, attention deficit hyperactivity disorder and post-traumatic stress disorder. Dr. Vaughn's letter concluded,

> "[Her] pattern of disturbed behavior and age inappropriate sexual behavior constitute one of the most serious cases of sexual perpetration and victimization of a child I have encountered in my clinical practice. It is essential for the well-being of this child that contact with immediate family members be suspended. It is critically important that [C.N.S.] feel 'safe' if her significantly disturbed behavior is to be stabilizing."

On November 14, 2000, DCS filed a petition for a temporary restraining order to enjoin the parents from further visitation with either child. The Department noted that D.S. had recently been charged with rape of a child and contended that further visitation would result in immediate and irreparable harm to the children. The court granted the restraining order. The record shows that on March 8, 2001, D.S. signed a waiver of trial by jury and petition to enter a "best interest" guilty plea on the charge of raping his twelve-year-old half-sister. He was sentenced to fifteen years in the penitentiary.

## II. TERMINATION OF PARENTAL RIGHTS

On April 30, 2001, DCS filed a petition to terminate the parental rights of both C.E.S. and D.S. The petition cited multiple grounds for termination, including abandonment, failure to follow the parenting plan, persistence of conditions, and incapacity to appropriately parent these children.

The court conducted its hearing on the petition on September 10, 2001. The mother and father were both represented by counsel, and a guardian ad litem represented the interests of the children. The Department non-suited the ground of abandonment, since under the circumstances neither of the parents was deemed to have willfully abandoned the children. D.S. was temporarily released from the penitentiary so he could announce to the court his intention to voluntarily relinquish his parental rights.

Aside from the parties, the testifying witnesses were the mother of C.E.S., the foster mother of C.N.S. and C.J.S., a supervisor for the Department, and Dr. Vaughn. At the conclusion of the proof, the attorneys for the parties presented their closing arguments, and the guardian ad litem explained why he believed it was in the best interest of the children that the parental rights of C.E.S be terminated.

The trial court agreed. In the final decree of guardianship, the court announced that grounds for termination had been proven by clear and convincing evidence, including failure to follow the plan of care, and that "the mother suffers from such mental incapacity to parent these children as would render her unable to parent these children now or in the near future." The court also found that it was in the best interest of the children that they be placed in the guardianship of DCS, with the right to place the children for adoption and to consent to such adoption *in loco parentis*. This appeal followed.

### III. ARGUMENTS ON APPEAL

### A. GROUNDS FOR TERMINATION

Parents have a fundamental right to the care, custody and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972). However, these rights are not absolute, and the State may sever the relationship between parents and children if it can both prove an appropriate ground by clear and convincing evidence, and that the termination is in the best interest of the children. *In re Drinnon*, 776 S.W.2d 96 (Tenn. Ct. App. 1988); *Santosky v. Kramer*, 455 U.S. 645 (1982).

Tenn. Code Ann. § 36-1-113(g) sets out the possible grounds for termination of parental rights, including the following:

> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;
> (3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

The trial court found that the evidence presented clear and convincing proof of the above-quoted grounds. C.E.S. points to countervailing proof in her testimony and that of her mother, which she claims should have prevented the trial court from declaring that DCS had met the heightened standard of proof required to terminate a parent's rights. In particular she argues that she met many of the goals of the permanency plan, that she has improved her living situation, and that with the help of her mother, it should be possible to safely return the children to her custody in the near future.

DCS points out that the court may rest its decision to terminate parental rights on any of the grounds alleged in the petition. *In re C.W.W.*, 37 S.W.2d 467 (Tenn. Ct. App 2000). It is not necessary for the State to prove all the grounds alleged, so long as the record contains clear and convincing evidence to support at least one of the grounds, and a consistent finding as to the best interest of the child.

In light of the unique obstacles to a normal and healthy childhood faced by C.N.S. and C.J.S., this discussion will focus on the mother's inability to meet the physical, medical, and emotional needs of these children. We note such a ground is encompassed by Tenn. Code Ann. § 36-1-113(g)(3)(A)(i), which allows termination based upon the existence and persistence of ". . . other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s) . . . ." *See also* Tenn. Code Ann. § 36-1-113(g)(7).

## B. THE NEEDS OF THE CHILDREN

The testimony of the foster mother and of Dr. Vaughn gives some indication of how difficult and challenging it would be to raise these children. The foster mother has a B.A. in psychology, and ten to twelve years experience working with special needs children. She has had both children in her care for two and a half years. She testified that C.J.S. has been diagnosed with cerebral palsy and Rubenstein Taybi Syndrome, a condition that normally causes mental retardation, as well as numerous congenital defects that may ultimately require surgery.

Although she is almost four years old, the child functions at about an eleven-month level. She does not speak and she has feeding problems, but with the help of an occupational therapist, she has learned to communicate with sign language to a limited extent and to eat most foods. She also has asthma, and could possibly die without the breathing treatments the foster mother administers. C.J.S. learned to walk about eight months before the court hearing. When she got sick, she stopped walking for a couple of weeks, and she required physical therapy and daily stretching of her hamstring muscles to get to the point that she could walk again.

The foster mother testified that even with the assistance of therapists, taking care of the children is a full-time job. She is grateful to have the help of her husband and her seventeen-year-old daughter, because without such help, she couldn't consistently give them the quality of care they need.

Six-year-old C.N.S. is more normal physically than her sister, but has serious behavioral issues to deal with. She suffers from extreme nightmares, sometimes wakes up screaming, and has problems with sleeping. She takes a number of medications to help control her behavior, and the dosage has to be adjusted from time to time to keep her stable. Dr. Vaughn has been her psychologist for two years and she sees him once a week. He testified that it was very important that the people in her life believe her accounts of abuse, and that if she were placed in an environment where they didn't believe her, she would probably end up being institutionalized, and at risk for further sexual abuse.

## C. THE CAPACITY OF THE MOTHER

C.E.S. testified to several improvements she has made in her life with a view towards maintaining a stable household for her children: She now lives in a three bedroom home with her mother; she is working on her G.E.D.; and she is actively looking for work, although she has not yet found any. Her mother testified that she was prepared to help her daughter with the care of the children, and that her current employment involves working with mentally and physically handicapped people. The mother works from 10:15 p.m. to 8:15 a.m., four days a week.

We note that C.E.S. has unresolved problems of her own to deal with, partly stemming from her upbringing. She was sexually abused by her mother's boyfriend when she was eight or nine years old. At age thirteen, she attempted suicide. She has been diagnosed with bipolar disorder, anxiety disorders and sleep disorders. She takes lithium for the bipolar disorder, and atarax for anxiety. She has suffered incidents of seizures in the past, and has never learned to drive. She has only a sketchy idea of what cerebral palsy is, and no understanding of her child's other medical conditions. Although she has expressed an interest in learning sign language so she can communicate with C.J.S., she has only managed to learn a few signs.

Further, C.E.S. has testified that she does not believe that C.N.S. was sexually abused by her father because "I have not seen him try anything around them," and that she does not believe that D.S. raped his twelve-year-old half sister. When asked whether she planned to divorce him, she said she did not know, and added that if it came down to the question of him or the kids, she "might have to go for the kids." In light of overwhelming evidence that C.N.S. was indeed a victim of severe prolonged sexual abuse, and of Dr. Vaughn's testimony as to the importance of her caregivers believing her, such a denial might be sufficient in itself to preclude the return of the children to C.E.S.

It is obvious to this court that C.E.S. has not even come close to acquiring the insight, the skills, or the knowledge that would be necessary before the children could safely be returned to her care. It also appears highly unlikely that she could learn them in a reasonable amount of time. We therefore believe the record contains clear and convincing evidence of conditions which in all reasonable probability would cause C.J.S. and C.N.S. to be subjected to further abuse and neglect if they were returned to their mother, and that it is in their best interest that the mother's parental rights be terminated.

### D. THE DEPARTMENT'S EFFORTS

C.E.S. also argues that DCS made no reasonable efforts to provide services designed to rehabilitate her and reunite her family. *See* Tenn. Code Ann. § 37-1-166. She mentions in particular that DCS failed to perform a requested home study on her mother's home, and that it did not try to place the children with a relative, despite alleged requests from two relatives. We note that the record does not contain any information to indicate that these relatives would have been capable of meeting the special needs of C.N.S. and C.J.S.

The quarterly progress reports prepared by the Department show that returning the children to their mother was the goal of the permanency plan until the sexual abuse reports led DCS to conclude that such a goal was unrealistic. The proof indicates that the Department furnished counseling services and parenting classes for C.E.S., and arranged visitation with the children prior to the filing of the restraining order. Since C.E.S. moved into her mother's home shortly before the court determined that further visitation with the mother was not in the best interest of the children, a home study would have served very little purpose. It appears to us that the efforts made by the Department were reasonable under the circumstances.

### V.

The order of the trial court is affirmed. Remand this cause to the Juvenile Court of Maury County for further proceedings consistent with this opinion. Tax the costs on appeal to the appellant.

_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.

-6-