# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

## IN THE MATTER OF T.S. AND M.S.

**Direct Appeal from the Juvenile Court for Rutherford County**
**No. 25646J      Ben Hall McFarlin, Jr., Judge**

---

**No. M1999-01286-COA-R3-CV - Decided July 13, 2000**

---

This case involves the termination of parental rights regarding two children who were removed from the parental home by the Department of Children's Services in 1995 and placed in foster care. The mother was ordered to take steps to remedy the deficiencies in the home and made some efforts to comply. After four years, DCS petitioned to terminate the mother's parental rights. The trial court found that the mother had failed to substantially comply with the Plan of Care and terminated the mother's rights on grounds (1) that the conditions that led to the children's removal continued to persist with little likelihood of remedy and (2) that the mother was incompetent to adequately provide for the children. Because DCS has established grounds for termination and has also established that termination is in the best interest of the children, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed and Remanded**

COTTRELL, J., delivered the opinion of the court, in which CANTRELL, P.J., M.S., and KOCH, J., joined.

J.G. Mitchell, III, Murfreesboro, Tennessee, for the appellant, Tina Rena Stacey.

Paul G. Summers, Attorney General and Reporter and Douglas Earl Dimond, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

### OPINION

The two children who are the subject of this action were removed from the home by the Department of Children's Services (DCS) in 1995 and placed in foster care. During the four (4) years between removal of the children from the home and the filing by DCS of the petition to terminate, the mother made efforts to improve her situation and her parenting abilities. DCS and other social services agencies provided help and training to the mother. After four years of effort, however, during which the children had been in various foster care settings, DCS concluded that the mother was still unable to provide the care and supervision the children needed and was not likely to become able to parent them. In the interest of making permanent placement of the children

possible, DCS initiated this termination proceeding.[1]

I.

The two children, both girls, T.S. (born 1991) and M.S. (born 1992), were removed from their parents' home in April 1995, after an altercation brought the police to the house. The children, who had apparently been the subject of previous referrals, were reported to be "in a neglectful condition being extremely dirty with numerous scratches on their bodies and appeared to be suffering from thrush and impetigo."[2] They were taken to the emergency room, along with their mother, who had been injured in the altercation. The mother seemed drunk and kept repeating, "I wash my kids." DCS obtained a protective custody order and filed a petition for temporary custody.

Following a hearing, the children were found to be dependent and neglected. Custody was placed with DCS, and the mother was ordered to find and maintain a home, to undergo psychological evaluation, and to attend parenting classes.[3]

At the time of their removal from the home, the children, at four and almost three years of age, were unable to communicate their needs. They were described as having had no training in social skills. They threw tantrums, which included head banging. They were subsequently determined to be "globally delayed," meaning developmentally delayed in many areas. In their initial placement, their "intense behaviors" resulted in a change to a "therapeutic" placement. They also displayed fear of the bathtub, fear of being abandoned by a caretaker, the need to be held and rocked often, hoarding food and otherwise eating as if they were starving.

The children lived in at least four foster homes between their removal from the home and the hearing to terminate the mother's parental rights. The trial court heard testimony from a DCS team leader, two DCS case managers, a DCS intern, a Ph.D. candidate who worked as a therapist for the mother, the children's special education teacher, and three of the children's foster mothers.

By the time of the hearing, the children had made progress in their education. Both needed special education due to their developmental delays, and needed educational assistance at home to supplement their school work. Their special education teacher testified that both children had

---

[1]The father was not served with process. A later hearing was anticipated regarding his parental rights.

[2]The DCS team leader who saw the children at the hospital estimated that the children had not been washed for three to five days. He said they had rashes and sores on their bodies, and that some of the sores appeared to be infected. Hospital staff had to wash the children to determine which marks on their bodies were dirt and which were bruises.

[3]The trial court also ordered the mother to undergo alcohol treatment. After an alcohol assessment, it was determined that she did not need alcohol treatment. The intoxication observed the night the children were removed was apparently an isolated incident.

2

progressed in school. T.S. still required special education, but was in a regular classroom most of the day. M.S. was significantly behind when she entered first grade, but had done much better after being placed back in kindergarten.

The girls had made progress in their behavior, as well. After removal from the first foster home because their "intense behaviors" indicated the need for a "therapeutic" placement, those behaviors have improved. Their first foster mother testified that, when they went to her home from the hospital, they were afraid of the bathtub. They remained afraid of the bathtub until they became used to it. She said the girls began shaking and trembling when she tried to take them anywhere, and that they required repeated assurances that she was coming back for them when she took them to visit their mother. Another foster mother described the children as "needy," stating that they wanted to be held and rocked a lot. She said they ate as if they were starving. After visits with their mother, the girls acted disrespectfully toward the foster mother, once calling her a liar and stating that their mother had told them that. A third foster mother testified that the younger child was initially afraid she would be left behind any time the foster mother got ready to go somewhere, although those fears seemed to have been assuaged. That foster mother related comments from one of the children that their mother told them she was going to steal them away from the foster home. She also testified that the children initially insisted on sleeping with the covers pulled over their heads, but that they no longer needed to do so.

One foster mother stated her opinion, that the children needed someone "capable of making sure they get what they need, protecting them." A case manager testified that the children will need help in high school, that "they will need all of the help that they can get and more than the average child." She stated that the longer the children were in state custody, the more difficult their integration into a stable environment would be. Testimony established that DCS had an adoptive placement for the children upon the termination of the parents' rights.

A DCS case manager began working with the mother after the children were removed, and developed a Plan of Care for her.[4] DCS then offered her a parenting class and vocational rehabilitation. She declined vocational rehabilitation, even though she was offered transportation and job training. She gave two reasons for her refusal to participate: because a job would lower her SSI benefits, and because she was "slow" and found keeping a job to be difficult. The mother took the parenting class, and attempted to use the parenting techniques she learned, although her attempts were described as inconsistent and ineffective. The therapist who provided the mother with individual counseling testified that the mother was "highly motivated," but that she requires "a lot of effort" to grasp the parenting concepts. A case manager observed the mother's visits with the children for a year and a half, but saw only minimal improvement. The visits between the mother and the children were described as "chaotic," and the case manager sometimes had to intervene. The mother could not control or engage her children, and required suggestions and approval from other adults. The mother participated in Regional Intervention Program (RIP), a program designed to help parents manage their children, for a few weeks. RIP personnel modified the program to meet

---

[4]The Plan itself is not part of the record before us.

the mother's needs and abilities. Despite the efforts and modifications of RIP personnel, the director said the mother made minimal progress in that program. The mother was offered counseling sessions through Guidance Center, but she dropped out when she became discouraged. DCS offered the mother transportation to the Steps Program, an alternative to counseling, but she declined to participate in the program.

The mother's IQ was assessed at 64, making her "borderline" for mental retardation. A case manager testified that the mother tried to comply with the Plan, but that she would, in all likelihood, never be able to cope with the children and make parenting decisions. She was described as very childlike and unable to understand the needs of the children, such as food, medical care, school needs, and the need for consistent rules. She was unable to use distraction techniques to stop the girls from fighting. The children did not respond well to the mother's attempts to discipline them. A case manager demonstrated a time-out technique, requiring the child to sit quietly after misbehaving, but the mother was not able to use the technique effectively. The DCS intern, who had supervised the mother's visits with the children for a few months, told of one visit in which the children, after being with the mother for about an hour, still had their coats and backpacks on. The mother was unable to determine the appropriate technique to use in various situations or to apply them appropriately in context. One counselor described the mother as having reached a "plateau" in her parenting abilities. The case manager did not doubt that the mother loved her children, but did not think she was capable of making sufficient changes to enable her to care for them. The mother was described as being simply unable to prepare the children for adult life.

The mother testified that she left the father after the children were taken into state custody. She said that she wanted her children back, and that she could help them with their educational needs. The mother had moved from the home she shared with the father and the father's other children and had lived in the same apartment for more than two years. She stated that she had completed parenting courses on two previous occasions before the series of classes ordered after the removal of these children, and that her rights to other children had been terminated. She originally said she had seven children and five had been "adopted out," but she corrected herself after she was prompted by her attorney, stating that she actually had five children and the rights to three of them had been terminated.

The trial court, after hearing the evidence, issued its order terminating the mother's parental rights, and the mother has appealed.

## II.

Because the decision to terminate parental rights affects fundamental constitutional rights,

4

courts apply a higher standard of proof when adjudicating termination cases. *See O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn. Ct. App. 1995). To justify the termination of parental rights, the grounds for termination must be established by clear and convincing evidence. *See* Tenn. Code. Ann. § 36-1-113(c)(1) (Supp. 1999); *State Dep't of Human Servs. v. Defriece*, 937 S.W.2d 954, 960 (Tenn. Ct. App. 1996). Evidence which satisfies the clear and convincing standard "eliminates any serious or substantial doubt concerning the correctness of the conclusion to be drawn from the evidence." *O'Daniel*, 905 S.W.2d at 188. "This heightened standard . . . serves to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

> The "clear and convincing evidence" standard defies precise definition. While it is more exacting than the preponderance of the evidence standard, it does not require such certainty as the beyond a reasonable doubt standard. Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. It should produce in the fact-finder's mind a firm belief or conviction with regard to the truth of the allegations sought to be established.

*O'Daniel*, 905 S.W.2d at 186.

Under this heightened standard of review, we must first review the trial court's findings in accordance with Tenn. R. App. 13(d). That review is *de novo*, with a presumption of correctness for the trial court's findings of fact, unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d). Then, we must determine whether the facts make out a clear and convincing case in favor of terminating the parents' parental rights. *See In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988).

Parental rights may be terminated in only a limited number of statutorily defined circumstances. Before termination, one or more of the asserted statutory grounds must be proved by clear and convincing evidence and the court must determine, also using the clear and convincing evidence standard, that termination is in the child's best interest. *See* Tenn. Code Ann. § 36-1-113(c)(2) (Supp. 1999).

The trial court's order provided, in relevant part:

The Court specifically finds that the Respondent has failed to substantially comply with her responsibilities under the Plan of Care and that the non-compliance was not a result of willful behavior however, pursuant to T.C.A. § 36-1-113(g)(3) and 36-1-113(g)(7)(B) the Respondent, due to mental impairment, is not capable of caring for the children. While there is no doubt that the Respondent loves her children, she is incapable of providing care for them. The testimony presented proved that the Respondent has reached a plateau in dealing with her children and there is no guarantee that she will ever be able to provide care on a daily basis for the children and the time spent waiting for this to occur would impair the ability for the children

to be integrated into a stable environment.

The Court further finds that the Department has exercised reasonable efforts to reunify the family however, the children have been removed from the home for a period of more than six (6) months, the conditions which led to removal continue to persist and the continuation of the parent and child relationship greatly diminishes the chances of the children to have a permanent and stable home. It is further specifically found [that] termination of parental rights of [the mother] is in the best interests of the children.

We interpret the trial court's order as basing termination on two grounds: (1) persistence of the conditions leading to removal (Tenn. Code Ann. § 36-1-113(g)(3)(A)) and (2) the mother's impaired mental condition which renders her unable to provide the care and supervision needed by the children (Tenn. Code Ann. § 36-1-113(g)(7)(B)).[5] If either ground in supported by the evidence, applying the clear and convincing standard, we must affirm if termination is in the children's best interest.

### III. The Conditions Which Led to Removal Persist

The trial court based the termination of parental rights on Tenn. Code Ann. § 36-1-113(g)(3)(A), which provides the following as grounds for seeking termination:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
(i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

No one disputes that the children had been removed from the home for more than six months.

---

[5]The mother asserts that the trial court also erroneously terminated her rights on the grounds she failed to substantially comply with the Plan of Care, pursuant to Tenn. Code Ann. § 36-1-113(g)(2), arguing that the evidence preponderates against such a finding. Although the trial court found that the mother had failed to substantially comply with her responsibilities under the Plan of Care, we do not interpret the trial court's termination to be based on that statutory ground.

In fact, they had been living in a series of foster care placements for four years while DCS gave the mother opportunity and assistance to improve her ability to provide care for the children. The original order placing the children in State custody found the children to be dependent and neglected, but provided no factual details regarding the basis for that decision. However, testimony at the termination hearing established the children's physical, emotional and psychological condition at the time of removal.[6] In addition, the original order required the mother to 1) find and maintain an adequate home for the children; 2) undergo a psychological evaluation to determine her ability to properly care for her children; and 3) successfully complete parenting classes and alcohol treatment. We are convinced that neglect of the children, resulting at least in large part from the mother's lack of parenting abilities, was a condition which led to the removal of the children.[7]

The evidence supports the trial court's determination that the mother's mental impairment prevented her from being able to care for her children and has affected her parenting in ways that have proved detrimental to the children.[8] It also supports the conclusion that these conditions existed

---

[6]Regarding the conditions which led to the removal of the children, the mother argues that the original petition for custody alleged that she was intoxicated and that the children were neglected. She claims that the case manager's testimony established that alcohol abuse was not a problem for her, and that the apparent intoxication was an isolated incident. She further argues that she substantially complied with the Plan of Care, as shown by her maintaining an apartment for more than two years, severing her relationship with the father, and completing the parenting class. She argues that she, as did the mother in *In re Drinnon*, 776 S.W.2d 96, 98, has, to the best of her ability, complied with the requirements set forth by DCS. These arguments assume that the intoxication, the nomadic nature of the life she shared with the father, and the lack of a third parenting class were the only problems faced by the mother. As the evidence at the hearing demonstrated, the conditions which led to removal included the overall neglect and the mother's inability to provide care to the children. Furthermore, the mother's reliance on *Drinnon* is misplaced. In that case, the Department of Human Services (which at that time performed duties now assigned to DCS) sought to return the children to their mother based on her improvements in parenting abilities and other life skills. Upon learning of the reunification plans, the foster parents sought to terminate the mother's rights and to adopt the children. In the case before us, DCS maintains that the mother is presently, and for the foreseeable future, incapable of caring for her children.

[7]Even if the mother's inability to parent was not a condition which led to removal, it clearly meets the statutory criteria of "other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent." Tenn. Code Ann. §36-1-113(g)(3)(A)(i).

[8]Tenn. Code Ann. § 36-1-113(g)(7)(B) (Supp. 1999) authorizes a court to terminate parental or guardianship rights "if it determines on the basis of clear and convincing evidence that: (i) the parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or

prior to the children's removal, during the four years since removal, and at the time of the trial. The mother obviously loves her children and has made changes in her living arrangements to provide a better environment. While she has generally complied with some DCS requests to participate in programs to improve her ability to parent, the mother is simply unable to provide appropriate care to her children. She is still unable to properly manage or discipline her children, even in the controlled surroundings of the DCS supervised visitation. Described as "childlike" herself, the mother is not able to understand her children's basic needs. Despite her best intentions, she is unable to understand the needs for consistent rules or for food and medical care. The children have been shown to have special needs; they are developmentally delayed and are in special education classes. They require help at home beyond that which is provided at school, and the mother is unable to provide that help or to understand the needs.

Further, the evidence presented gave no indication that the mother's condition is likely to improve to the extent that she will be able to care for the children in the near future. No witness was able to hold out hope that the mother's parenting abilities would improve beyond the level which has been reached in the four years since the children's removal.

In *State Dep't. of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990), our Supreme Court found a parent's "mental disability" to be a condition which led to the removal of the child from the home and that the mother's refusal to accept treatment prevented elimination of that condition. Further, the failure to remedy conditions jeopardizing the children, or the failure to follow the plan of care (which is designed to remedy the situation sufficiently to safely allow the return of the children) need not be the result of a willful action. *See Smith*, 785 S.W.2d at 338. In reversing a Court of Appeals decision to the contrary, the Supreme Court stated:

> The holding of the Court of Appeals in this case - - that "mental disability" can not be the basis of termination of parental rights since the acts of the mentally disabled parent are not willful - - would nullify a significant part of the legislative plan for the welfare of dependent and neglected children. An obvious result of the holding is to condemn a child, whose parents are unfit to properly care for the child because of mental illness, to a life in serial foster homes without any possibility of a stable, permanent home.

*Id.*

While the mother in *Smith* was mentally ill and refused to accept treatment, a similar

---

resume the care of and responsibility for the child in the near future, and (ii) that termination of parental or guardian rights is in the best interest of the child." The next section, Tenn. Code Ann. § 36-1-113(g)(7)(C) provides that in such circumstances, "no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated."

conclusion may be reached when a parent cannot be rehabilitated to be able to care for the children. In *State Dep't. of Human Servs. v. Adams*, No. 03A01-9403-CV-00114, 1994 WL 579911 at *9 (Tenn. Ct. App. Oct. 24, 1994) (no Tenn. R. App. P. 11 application filed), this court affirmed the termination of parental rights of parents who, after efforts by various social services and counseling agencies, some of which the parents took advantage of, were unable to improve their parenting skills to a level where the children could be returned to the home. The parents completed a parenting class, but "were never able to demonstrate any ability to use the techniques taught in those classes." The court found these parents "for whatever reason" were "incapable of responsible parenting." The result of this conclusion was termination on the ground the parents had "not adjusted their circumstances, conduct, or conditions to make it in the children's best interests to return to their natural parents in the foreseeable future." *Id*.

Similarly, in *In the Matter of: T.J.H. and M.S.M.*, No. 01A01-9712-CH -00736, 1998 WL 313719 at *4 (Tenn. Ct. App. June 12, 1998) (no Tenn. R. App. P. 11 application filed), this court affirmed termination of parental rights on the basis of Tenn. Code Ann. § 36-1-113(g)(3)(A). In that case, this court found that the two most serious persistent conditions were the parents' mental illnesses and their inability to manage their medications and further found that neither parent had remedied their inability to manage their disorders. The court also found that the evidence that the children's circumstances had improved since placement in a foster home provided clear and convincing evidence that termination of parental rights would hasten the children's integration into a stable, permanent home.

These opinions indicate that a parent's continued inability to provide fundamental care, even though not willful, whether caused by mental illness, mental impairment, or some other cause, constitutes a condition which prevents the safe return of the child to the parent's care. Where, as here, efforts to provide help to improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified.

We agree with the trial court that DCS has shown, by clear and convincing evidence, that the mother,

> is not capable of caring for the children . . . and incapable of providing for them. . . . [T]here is no guarantee that she will ever be able to provide care on a daily basis for [them] and the time spent waiting for this to occur would impair the ability of the children to be integrated into a stable environment.

Thus, we also agree with the trial court's conclusion that DCS has shown, through clear and convincing evidence, that, pursuant to Tenn. Code Ann. § 36-1-113(g)(3), the conditions which led to the children's removal from the home continue to persist and prevent the children's return to the home, that there is little likelihood that the conditions will be remedied in the near future, that the continuation of the parent-child relationship greatly diminishes the children's chances of being

placed in a permanent home.[9]

## IV. Termination of Parental Rights is in the Children's Best Interest

Once statutory grounds for termination have been established, the court must determine, based on clear and convincing evidence, that termination of parental rights is in the best interest of the children. *See* Tenn. Code Ann. § 36-1-113(c)(2) (Supp. 1999). The mother argues that the trial court did not consider the statutory factors it should have considered in deciding whether terminating her parental rights was in the best interest of the children. Tenn. Code Ann. § 36-1-113(i) states:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward other children in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

---

[9]Although the trial court found the mother's impaired mental condition to constitute a separate, additional ground for termination pursuant to Tenn. Code Ann. § 36-1-113(g)(7)(B) (Supp. 1999), which became effective January 1, 1996, it is unnecessary for us to consider that finding since we have affirmed the finding that the ground set out in Tenn. Code Ann. § 36-1-113(g)(3)(A) has been proved clearly and convincingly. The limitations which prevent the mother from effectively parenting are also the conditions which led to removal and prevent the return of the children to the mother.

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

While the trial court did not explicitly state that it had considered the statutory factors, the court's findings regarding the existence of grounds herein are applicable to the best interest analysis, and we cannot say that the trial court failed to consider them. Our own review of the evidence, in light of those factors, compels our agreement with the trial court, that the termination of the mother's rights is in the best interest of these children. The mother has not made an adjustment of conditions, specifically her lack of parenting ability, which would make it safe and in the children's best interest for the children to be in her home. *See* Tenn. Code Ann. § 36-1-113(i)(1). She has failed to make the adjustment, despite reasonable efforts by DCS, and such adjustment does not reasonably appear possible. *See* Tenn. Code Ann. § 36-1-113(i)(2). The mother's mental impairment and consequent inability to parent would prevent her from providing safe and stable care for the children. *See* Tenn. Code Ann. § 36-1-113(i)(8). Considering the above factors, and the fact that an adoptive placement is available for the children, we agree with the trial court that termination of the mother's parental rights is in the best interest of the children.

We are fully aware of the gravity of the decision to terminate a parent's rights. The mother herein clearly loves her children and has made many improvements in her life. However, as stated by appellee, "[D]espite years of effort from a number of service providers, [the mother] was unable to remedy the persistent conditions in their lives that prevented the children's return." This mother would like to parent her children, but is simply unable to provide the care they need. As regrettable as we find terminating the rights of a parent who has made efforts to become a competent parent, to do otherwise would, in all likelihood, leave the children in foster care until they reach the age of majority.

V.

We affirm the order terminating the mother's parental rights and remand the case to the trial court for such further proceedings as may be required. Costs of this appeal are taxed to the mother, for which execution may issue if necessary.

11