IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned On Briefs August 1, 2001

# IN RE: L.S.W., et al.

**Appeal from the Juvenile Court for Robertson County**
**No. D17234     Max D. Fagan, Judge**

_____

**No. M2000-01935-COA-R3-JV - Filed September 6, 2001**

_____

This case involves the termination of parental rights of the mother of four children who were removed from the mother's home by the Department of Children's Services in 1998 and placed in foster care. DCS devised a Plan of Care for the mother, which, among other things, required her to address her drug and alcohol addictions. During the two and one-half years between the removal of the children from the home and the hearing on the petition to terminate parental rights, the mother made token efforts to improve her situation, but her substance abuse continued. The trial court terminated the mother's parental rights on multiple grounds, including the ground that the conditions that led to the children's removal continued to persist with little likelihood of remedy. Because DCS has established grounds for termination and has established that termination is in the best interest of the children, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM C. KOCH, JR., J., joined.

Joe R. Johnson, II, Springfield, Tennessee, for the appellant, K.L.S.

Paul G. Summers, Attorney General and Reporter, Douglas Earl Dimond, Assistant Attorney General, Nashville, Tennessee, for the appellee, Department of Children's Services.

## OPINION

In February 1998, the Department of Children's Services ("DCS") filed a petition for temporary custody of the four children[1] who are the subject of this proceeding, alleging that the

_____

[1]The children are L.L.W., a boy born in 1989, L.L.S., a boy born in 1990, L.L.W., a boy born in 1991, and L.S.W., a girl born in 1993. Because of the similarity of their initials, the boys shall be referred to individually as the first, second or third son, as appropriate, and the girl will be referred to as the daughter.

children were dependent and neglected and that the mother was "unable to properly provide for the children due to her own drug use and lack of parenting skills." In that petition, DCS stated that the department had been involved in the case since July 1997 and had

> provided homemaking services, arranged counseling for [the first son], offered drug treatment to the mother, arranged day care for all of the children, assisted [the mother] in applying for Department of Human Services assistance, provided Christmas gifts for the children, and . . . [provided] consistent monitoring of the home situation. The mother has refused to accept some of the services and has refused to cooperate with others. The mother has refused to cooperate with the Department for Human Services, the school system officials, therapists and day care providers. Her refusal to avail herself of the services places these children at risk of harm and neglect. . . .

> [T]here are no less drastic alternatives to removal from the care, custody, or control of the children's parent which will reasonably and adequately protect the children's health and/or safety. . . .

> [I]t is contrary to the children's best interest to remain in the care, custody, and control of their parent, [and] reasonable efforts . . . were made to prevent removal of the children.

An affidavit of a DCS case manager was attached to the petition, which included the above behaviors on the part of the mother, and added:

> The mother has not complied with counseling for [the first son] to deal with his behaviors . . . . The mother does not comply with the DCS Safety Plan in which the grandmother is not to care for the kids as she was charged with child neglect for being intoxicated while watching the children. The mother has admitted to using marijuana and cocaine on a regular basis and to having drug traffic in the home. The mother admits to leaving the children[2] alone in the home. The mother has been [indicted] for physical abuse on [the second son] in November of 1997.

The following day, an attorney was appointed to represent the mother[3] and a guardian *ad litem* was appointed for the children.[4] One month later, the court ordered that the children remain in state custody. The court reviewed the situation over the next few months, and in August 1998

---

[2]At the time the petition was filed, the children were ages four through nine.

[3]Two men are alleged to be fathers of the children. One was personally served with process. The other's whereabouts were unknown so he was notified by publication in the local newspaper. Neither appeared at the hearing of this matter. Their parental rights were terminated on the ground of abandonment, and neither has appealed.

[4]The children have been appointed five successive guardians *ad litem* during their time in the custody of DCS.

entered an order allowing the mother to have unsupervised visits with the children.

In January 1999, an order on review stated, "Review to be made to assess progress toward plan of care compliance. If significant efforts are not made within 6 months, petition for termination shall be instituted." The following month, on February 25, 1999, one year after the children were taken into DCS custody, the court again reviewed the case and noted, "[The mother] with counsel states that plan is 'somewhat' reasonable," but reaffirmed its order that termination proceedings should begin within six months if "significant progress is not apparent." Further, the court ordered:

> Supervised visitation only with children. If incident of corporal punishment or altercation during visit with children or supervisor(s) occurs, visitation may be immediately terminated and future visitation suspended until such time as the court may review the situation.

Also, in February 1999, the daughter was referred to Omni Vision Therapeutic Foster Care and Adoption ("Omni Vision") for placement in a therapeutic foster home, in which the "professional parents" had received extensive training. The three sons were referred to Omni Vision in June 1999, and all four children remained with Omni Vision at the time of the July 2000 hearing.[5]

In June 1999, DCS filed a Notice of Permanency Plan Hearing, in which it notified the mother that a hearing would be held "to determine the future status of the child[ren], including, but not limited to, whether the child[ren] should be returned to the parent, should be continued in foster care for a specified period, should be placed for adoption, or should, because of the child's special needs or circumstances, be continued in foster care on a permanent or long-term basis, and shall determine the extent of compliance of parties with the terms of permanency plan . . . ." In the attached "Affidavit of Reasonable Efforts," the case manager repeated the problems that existed at the time of removal, and added that "Services have been offered since 7-97 to no avail, with no progress made. . . . [and] the mother has not complied with court-ordered drug testing and still has not provided housing for the children."

The hearing was held on June 9, 1999 before a referee of the juvenile court. A subsequent order stated that it was in the best interest of the children for custody to remain with DCS, and that reunification had not been achieved because "the mother has only recently entered into drug treatment which has been a long-time requirement."[6] The referee ordered that the children remain in foster care, and set the case for review in three months. Shortly before the scheduled review, a new guardian *ad litem* was appointed for the children. Within two weeks of his appointment, the guardian *ad litem*, moved for termination of even supervised visitation, stating:

---

[5]For a time all four children were in the same therapeutic foster home. The three younger children remained there, but the first son eventually required placement in a "more specialized continuum" in part because he had "witnessed and experienced the majority of the abuse." Testimony at the hearing indicated that the foster family planned to adopt the three children in their care.

[6]The mother left the drug treatment program without completing it.

[The children] have been examined by a licensed psychological examiner [who recommends] that in the best interest of the children, termination of visitation by the mother be requested to the Court. The children after visitation become confused and agitated and cause quite a behavioral problem.[7]

The supervised visits were "terminated temporarily until further review," in October 1999. The petition for termination of parental rights was filed on March 23, 2000, more than two years after the children were taken into state custody, and a hearing was held on July 12, 2000.

By the time of the hearing, the mother had made no progress toward regular employment, suitable housing or improvement in conditions. The mother testified that she was currently incarcerated, but that she intended to seek drug rehabilitation after she was released. She had made an appointment just before trial for an assessment, but had been unable to attend because she was incarcerated. She said she had not seen the children in about ten months, and that she missed them. The mother acknowledged that the drugs were a serious problem for her, and that the drugs kept her "out of a job and from being able to focus on doing what a parent should be doing . . . ." The mother had been warned and had known since 1998 that she would lose her children if she continued to use drugs. She conceded that conditions were no different at the time of trial from those at the time of the children's removal. She acknowledged that it could be years before she was capable of taking the children back. She asked the court to keep the children in long-term foster care, so that she might retain the possibility of getting her children back.

Employees from Omni Vision testified that the children had improved greatly in foster care and that the children had stated that they did not want to visit with their mother. They had no desire to be reunited with their mother and feared that prospect. One child had been beaten while living with the mother; another had been left without food so long he was hospitalized for dehydration. One employee testified that the foster parents wanted to adopt the three children in their care.

After hearing the evidence, the trial court terminated the mother's parental rights finding multiple grounds, and stating in its order:

The children have been removed by order of this Court for a period of six (6) months; the conditions which led to their removal still persist; . . . there is little

---

[7]At the hearing, an Omni Vision employee described the visits between the mother and children as "probably the most chaotic" she had seen in her ten years of supervising visits, and that she felt that the mother encouraged the chaos. She testified that the mother threatened and abused the children, even during supervised visits. She stated that the mother sometimes picked up the children and hit them against the wall. She related an incident after a visit in which the mother picked up a stick in the parking lot and threatened to hit the children. The children ran behind the foster parents and said, "No, you can't whip us anymore; we're safe now." She recounted incidents in which the mother allowed the children to scream, jump from furniture, and throw things across the room. Eventually, the visits required posting additional employees outside the door of the room where the visit took place to prevent the chaos from erupting into the rest of the building. The employee also stated that the mother resented any suggestions on how she might control the children's behavior, and noted that the children sometimes told her that they had smelled alcohol on the mother's breath during the visit.

likelihood that these conditions will be remedied at an early date so that these children can be returned to [the mother] in the near future; the continuation of the legal parent and child relationship greatly diminishes the children's chances of early integration into a stable and permanent home.

. . . Specifically, the mother has failed to adequately address her drug addiction and she has failed to cooperate with the services and programs that the Department has set up for her. She continues to abuse drugs and has not rehabilitated herself to the point that she can care for her children.

At the time of the removal, the mother admitted her drug addiction and her inability to care for her children. She also admitted to repeatedly leaving them alone or leaving them in the care and supervision of her mother who is an alcoholic. [The mother's] home was filthy and her four children were severely neglected. She has not cooperated with any of the services that the Department has provided, and she has not completed drug treatment. She has not been able to meet her children's most basic physical needs, let alone their emotional and psychological needs, and there is little likelihood that she will ever be able to be a good or even adequate mother to her children.

. . . DCS became involved in the case back in July of 1997 and the mother refused to cooperate with the services that were offered and the children came into state custody. The mother acknowledged the need to address her drug addiction and related issues as early as January of 1999, and yet she did not do so. She has asked the Court today for more time to address these issues, but the Court must note that the mother has made no meaningful effort to ever address these problems and there is no reason to believe that she would at this late date. She is asking that the lives of these children be held in limbo while she decides whether or not she will address these issues. This approach is not acceptable to the Court in that it is contrary to the best interests of the children. The mother has already had years to address her problems and the children cannot be asked to wait any longer. The Court finds that the mother has not complied with the plan of care and there is no reason to believe that she would comply [if] given additional time.

. . . .

It is in the best interest of the children and the public that all of the parental rights of Respondents to these children be forever terminated, and the complete custody of [the children] be awarded to the State of Tennessee, Department of Children's Services, with the right to place them for adoption and to consent to such adoption *in loco parentis.*

-5-

On appeal, the mother challenges the trial court's termination of parental rights. She does not dispute that grounds for termination exist, but argues that termination is not in the best interest of the children.

## I. Standard of Review

Because the decision to terminate parental rights affects fundamental constitutional rights, courts apply a higher standard of proof when adjudicating termination cases. *O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn. Ct. App. 1995). To justify the termination of parental rights, the grounds for termination must be established by clear and convincing evidence. Tenn. Code. Ann. § 36-1-113(c)(1); *State Dep't of Human Servs. v. Defriece*, 937 S.W.2d 954, 960 (Tenn. Ct. App. 1996). Evidence which satisfies the clear and convincing standard "eliminates any serious or substantial doubt concerning the correctness of the conclusion to be drawn from the evidence." *O'Daniel*, 905 S.W.2d at 188. "This heightened standard . . . serves to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

Under this heightened standard of review, we must first review the trial court's findings in accordance with Tenn. R. App. 13(d). That review is *de novo*, with a presumption of correctness for the trial court's findings of fact, unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d). Then, we must determine whether the facts make out a clear and convincing case in favor of terminating the parents' parental rights. *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988).

Parental rights may be terminated in only a limited number of statutorily defined circumstances. Before termination, one or more of the asserted statutory grounds must be proved by clear and convincing evidence and the court must determine, using the clear and convincing evidence standard, that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2).

## II. The Conditions Which Led to Removal Persist

The trial court based the termination of parental rights in part on Tenn. Code Ann. § 36-1-113(g)(3)(A), which provides the following as grounds for seeking termination:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

On appeal, the mother does not dispute that statutory grounds were proved to exist. We find that the elements of Tenn. Code Ann. § 36-1-113(g)(3)(A) have been met. The children had been removed from the home by order of a court for more than six months. They had been in foster care for two and one half years at the time of the hearing. The conditions which led to the children's removal were the abuse and neglect caused primarily by the mother's drug and alcohol use. At the time of trial, that drug and alcohol use persisted. Similarly, there is little likelihood that the condition will be remedied at an early date so that the children can be safely returned to the mother. This mother has had more than two years, and assistance, to deal with her drug problem. She was told, even before the children were removed from her care, that her drug use created a problem for the children. She did not take steps to remedy the situation, and the children were taken into state custody. Even after the children were in foster care, the mother made only token efforts to overcome her dependency. At trial, she claimed to want her children back. However, she had been simply unwilling or unable to put the children's needs above her own dependency. She had made no demonstrable efforts to provide these children with a safe environment.

The final element of the statute, "[t]he continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home," has also been met. Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii). These children need a permanent home where they can receive proper care and feel safe. The mother cannot provide a permanent stable home for the children and is unlikely to be able to do so in the near future. Absent termination of the mother's rights, the children cannot hope for a permanent, stable home. Even the mother acknowledged it might be years before she could provide a safe and stable home for the children. Her lack of effort after the children's removal makes that possibility even more remote.

DCS has proved, through clear and convincing evidence, that, pursuant to Tenn. Code Ann. § 36-1-113(g)(3)(A), the children have been removed from the home of the parent by order of a court for a period of six months, and the conditions which led to the children's removal from the home continue to persist and prevent the child's return to the home, that there is little likelihood that the conditions will be remedied in the near future, and that continuation of the parent-child relationship greatly diminishes the children's chances of being placed in a permanent home. Thus, statutory grounds[8] for termination have been proved and we turn to whether termination of parental rights is in the best interest of the children.

---

[8]The trial court found multiple grounds for termination of the mother's parental rights. It is not necessary for us to address the other grounds because we have affirmed the trial court's determination that the ground set out in Tenn. Code Ann. § 36-1-113(g)(3)(A) has been proved clearly and convincingly, and the mother does not dispute that grounds exist.

III. Termination of Parental Rights is in the Children's Best Interest

Once statutory grounds for termination have been established, the court must determine, based on clear and convincing evidence, that termination of parental rights is in the best interest of the children. Tenn. Code Ann. § 36-1-113(c)(2). Although the mother admits she is not presently fit to parent the children, and may not be so for a number of years, she argues that it would be in the best interests of the children to have the children placed in long-term foster care "until such time as she could become drug free and able to support her children in a stable home environment." She contends, "The best interests of the children are served by them having an opportunity at some point and time to have a meaningful relationship with their mother. If her rights are terminated, she has no chance at all to ever build such a relationship."

Tenn. Code Ann. § 36-1-113(i) states:

In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Our own review of the evidence, in light of those factors, compels our agreement with the trial court that the termination of the mother's rights is in the best interest of these children. The mother has not made an adjustment of conditions, specifically her use of drugs and alcohol, which would make it safe and in the children's best interest to be in her home. Tenn. Code Ann. § 36-1-113(i)(1). She has failed to maintain employment or suitable housing. Her interactions with her children at even supervised visits were harmful to the children and had to be stopped. She has failed to make adjustments, despite reasonable efforts by DCS, and such adjustment does not reasonably appear possible. Tenn. Code Ann. § 36-1-113(i)(2). Certainly, there is "such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the children in a safe and stable manner." Tenn. Code Ann. § 36-1-113(i)(7). Further, the mother's mental and emotional status would be detrimental to the children and would prevent the mother from providing safe and stable care and supervision for the children. Tenn. Code Ann. § 36-1-113(i)(8). Considering the above factors, and the children's need for permanency, we agree with the trial court that termination of the mother's parental rights is in the best interest of the children.

The General Assembly has determined that one of the primary purposes for our statutory system of child removal, foster care, and adoption is "to protect [children] from needless prolonged placement in foster care and the uncertainty it provides, and to provide them a reasonable assurance that, if an early return to the care of their parents is not possible, they will be placed in a permanent home at an early date." Tenn. Code Ann. § 37-2-401(a). Our courts have recognized the significance of permanency as the goal of decisions involving future placement of children and termination of parental rights. *See, e.g., State Dept. of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990) (The consequence of denying termination of parental rights of parents who were unfit due to mental illness would be "to condemn a child . . . to a life in serial foster homes without any possibility of a stable, permanent home.")

In a similar case, a mother who could not overcome her addiction argued that, while the statutory grounds existed, termination of her parental rights was not in the children's best interest. *State Dep't. of Children's Servs. v. Hunter*, No. 1999-02606-COA-R3-CV, 2000 WL 313549, at *1 (Tenn. Ct. App. Mar. 29, 2000) (no Tenn. R. App. P. 11 application filed). That mother visited her children frequently, testified that she and her children had bonded as a family, and claimed to be making progress in the treatment of her drug abuse, but had used illegal drugs shortly before the hearing on the petition to terminate her parental rights. *Id.* at *3. This court affirmed the trial court's termination of parental rights, stating:

> [T]he judge also felt compelled to recognize . . . that despite having a considerable amount of support from DCS for almost nineteen months, [the mother] had made very little progress towards the goals she had to reach before being reunited with her children; that the children were getting older and that they needed stability in their lives; that being an effective parent involves far more than visiting. . . . [W]e believe [the mother's] failure to make fundamental adjustments in her life makes the termination of her parental rights an inescapable conclusion. Continuation of the

parental relationship would eliminate any realistic possibility of the children being integrated into a stable and permanent home. It is in their best interest that her parental rights be terminated.

*Id.* at *3-4; *see also In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *6-7 (Tenn. Ct. App. July 21, 2000) (no Tenn. R. App. P. 11 application filed) (quoting *Hunter* for the same proposition).

We are fully aware of the gravity of the decision to terminate a parent's rights, but we think the reasoning in *Hunter* and *In re K.A.H.* applies here with equal force. This mother states that she would like to regain custody of her children "at some point," but she has shown that she is simply unable to overcome her dependency on drugs and alcohol or to make improvements in her living conditions or her ability to parent her children. Three years passed between the time DCS became involved with the mother and the termination hearing. The fact that she now admits she has a problem and two weeks before the hearing asked her counselor how to get back into drug rehabilitation, is truly too little, too late. The children need stability in their lives, and the mother has proved herself unable to provide that stability. To do other than affirm the termination of parental rights would leave these children "in limbo" indefinitely, and we cannot agree that long-term foster care is in the children's best interest.

## IV. Conclusion

We affirm the order terminating the mother's parental rights and remand the case to the trial court for such further proceedings as may be required. Costs of this appeal are taxed to the mother, for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE