IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 16, 2002

## IN THE MATTER OF: D.D.V., A CHILD UNDER EIGHTEEN (18) YEARS OF AGE

**Appeal from the Juvenile Court for Wilson County**
**No. 430     Barry Tatum, Judge**

-------

**No. M2001-02282-COA-R3-JV - Filed February 14, 2002**

-------

The State filed a petition to terminate parental rights to a four-year-old boy. Only the mother contested the action. The trial court granted the petition, terminating the mother's parental rights on multiple grounds, including abandonment and failure to comply with a plan of care. We reverse as to the mother, because we do not believe any of the grounds were proven against her by clear and convincing evidence, as is required by statute.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Reversed in Part; Affirmed in Part; and Remanded**

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which WILLIAM C. KOCH, JR. and WILLIAM B. CAIN, JJ., joined.

Debra L. Dishmon, Lebanon, Tennessee, for the appellant, M.M.V.

Paul G. Summers, Attorney General and Reporter; Douglas Earl Dimond, Assistant Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. A CHILD GOES INTO FOSTER CARE

Eighteen-year-old M.M.V. gave birth to D.D.V. on December 16, 1996. The place on the birth certificate where the name of the father would normally appear was left blank, and the individual the mother considered to be the child's father played no positive role in his upbringing, and a very minor role in the proceedings that are the subject of this opinion.

D.D.V. first came to the attention of the Department of Children's Services (DCS or "the Department") as the result of three trips to the emergency room within a fourteen day period in October and November of 1997. M.M.V. brought her young son to the ER each time because of an

injury to the head area. The injuries were a cut to the forehead, a cut lip and gum, and a cut or puncture of the upper palate and throat. None of the injuries required hospital admission or stitches, but Dr. Stephen Claycomb, the treating doctor, was concerned by the occurrence of so many injuries in so short a time, and he suspected the possibility of abuse.

Dr. Claycomb was particularly concerned about the third injury, because in his experience it was unusual for a child so young to suffer such an injury. M.M.V. stated that the injury occurred while D.D.V. was carrying a radio, with the antenna in his mouth. The doctor testified at deposition that it takes a good bit of force to pierce the upper palate, and that it generally happens when a child falls while running with an object in its mouth. Because D.D.V. was so young, the doctor doubted the injury had occurred in this way. But M.M.V. testified that D.D.V. walked very early, and was running almost as soon as he learned to walk.

The Department filed an emergency petition for temporary custody of the child on November 12, 1997, alleging that he was dependent and neglected, and that any delay could cause him irreparable harm. The Juvenile Court appointed a guardian ad litem for D.D.V. on the same day. After a hearing, the court awarded temporary custody of the child to DCS, and he went into foster care. A Court-Appointed Special Advocate (CASA) was named to act as D.D.V.'s guardian shortly thereafter.

## II. THE PLAN OF CARE

On December 3, 1997, M.M.V. signed a plan of care prepared by the Department with the goal of reunification. Among other things, the plan required the mother to pay 21% of her income for child support, contact DCS at least once a month, notify the Department of any changes in circumstances, and submit to random drug screens.

The first review of the plan was conducted on February 18, 1998. M.M.V. was found to have complied with most of her tasks (although the child support payments were not mentioned), to have attended parenting classes, and to have visited D.D.V. regularly. The Department stated that M.M.V. needed to go to counseling and maintain employment, and recommended that the child remain in State custody. The record contains a series of subsequent progress reports that all show M.M.V. in compliance with most of the elements of the plan of care, but experiencing continuing difficulties with employment and housing.

The Department modified the parameters of its plans several times, requiring at one point, for example, that M.M.V. demonstrate that she had remained in the same job for three months (which she apparently did several times), but later increasing it to six months. DCS consistently stated that stable employment and stable housing were the most important goals for M.M.V. to accomplish.

M.M.V. had herself been in foster care for much of her childhood, and did not have the support of family members to fall back upon. She only had an eighth grade education, and she had

no job skills when the State took custody of her child. The Department made her situation even more difficult by declaring that the public housing project in Lebanon, Tennessee where M.M.V. lived was too dangerous a neighborhood to bring her child into, and that she could not be reunited with him unless she could present them with a copy of a lease or mortgage agreement with her name on it, and photographs of the living quarters. It should not be surprising that finding housing that met the Department's requirements presented the greatest difficulties for her.

M.M.V. had promptly responded to the Department's concerns by moving out of her subsidized two bedroom apartment, but was unable to rent another apartment, in part because of an unpaid bill the housing authority claimed she owed, and which she contested. She found herself homeless, but was later able to stay with friends, moving every few months.

The Department judged her to be non-compliant with the requirement that she notify them every time she changed her address, but she testified that limitations in the leases of her friends prohibited them from housing additional people in their apartments, and she did not want to get them in trouble. Though she did not maintain contact with DCS to the degree required by her plan of care, M.M.V. never lost contact with her son, and she exercised both supervised and unsupervised visitation on a regular basis, in accordance with the Department's changing requirements.

At one point, M.M.V. filed a motion to have her child returned to her. She had found a job, and acquired temporary housing when D.D.V.'s godmother Robin Lucas invited M.M.V. to move into her apartment. On February 2, 1999, the court ordered that physical custody of D.D.V. be returned to his mother on a 90 day trial home placement. Four days later, the child returned to the emergency room, having ingested psychotropic pills. The court returned temporary custody of D.D.V. to the State, finding that the need for foster care continued to exist.

M.M.V. testified at trial that the pills her child ingested had belonged to Ms. Lucas, who was disabled and used a wheelchair. She contended that it was not possible to place Ms. Lucas' medication totally beyond the reach of an active toddler, without also making access to the medication difficult for Ms. Lucas. We note that M.M.V. passed all her drug screens, and that the State acknowledged that there were no indications that she abused drugs or alcohol.

M.M.V. worked at a number of different jobs. She sometimes changed jobs because of transportation problems, or in order to take another job that paid better. She also experienced periods of unemployment. Many of her jobs were in nursing homes or hospitals. She testified that she very much enjoyed working with patients, particularly elderly patients. At some point she obtained certification as a nursing technician.

In 1999, M.M.V. became pregnant again. A few months before her due date, she met the Reverend Joysteen Lyles, pastor of a Lebanon church known as the Potter's Wheel. The pastor and some of the church members mobilized to help M.M.V. They provided a bedroom in a church-owned residence for her, furnished many of her daily needs, and furnished counseling and teaching

for her. Reverend Lyles brought M.M.V. to the hospital, and was present in the delivery room when her daughter, K. V., was born on November 11, 1999.

Since M.M.V. was living on church property, Reverend Lyles felt that she should comply with the unwritten rules that such a situation implies. One weekend, M.M.V. left with her baby to stay with a friend, and did not contact anyone at the church until she returned several days later. Reverend Lyles then asked her to leave. K.V. was subsequently placed in foster care, and ultimately wound up in the same foster home as D.D.V. M.M.V. continued to go to church at the Potter's House, and Reverend Lyles testified that she and her parishioners remained committed to helping M.M.V. if she needed it.

### III. TERMINATION PROCEEDINGS

### A. DCS CHANGES DIRECTION

In the Spring of 2000, the CASA agent prepared a confidential report for the benefit of the court, which recommended that M.M.V.'s parental rights be terminated. The agency noted that M.M.V. had not managed to obtain stable housing or employment despite the more than two years that D.D.V. had been in custody, and stated that after such a period, "this case qualifies for mandated TPR." *See* Tenn. Code. Ann. § 36-1-113(h).

After conducting a periodic review of the case on May 17, 2000, the Department itself recommended for the first time that M.M.V.'s parental rights be terminated, and that D.D.V. be adopted. Among the items checked on the review summary form were that M.M.V. had made good progress toward reducing the risks that necessitate continued foster care, but that reasonable efforts had been made to reunite the family, and the need for foster care continued to exist.

Clinical psychologist Sandra DeMott Phillips prepared a psychological evaluation of M.M.V. contemporaneously with the Department's review. Dr. Phillips noted that because of her family history and her experiences with foster care as a child, M.M.V. had deficits as a parent, and was resentful of authority. She observed that "a therapist or caseworker is likely to find her difficult." The psychologist also stated that the goals of achieving stable employment and a stable living situation were good ones for her, but that to accomplish them, she needed a mentor. The report concluded,

> "Though it is time-consuming, a DCS worker would find it easier to work with her if he/she took the time to hear the story of her life in her own words. She is very emotionally needy and such time spent with her would help establish a better relationship. Then she would be able to accept better the constructive criticism she needs to hear, knowing that the worker cares about her as a person who has had a particularly difficult life."

On September 26, 2000, the Department of Children's Services filed its petition to terminate M.M.V.'s parental rights to D.D.V., as well as the rights of any individual who could claim paternity of the child. The petition was signed by Patty Graves, M.M.V.'s case manager, who also submitted an Affidavit of Reasonable Efforts, which included a recitation of the services DCS had provided to unify the family. The only services listed were "parenting classes, psychological evaluations, parenting assessments, drug and alcohol assessment and supervised visitations with her son."

## B. THE TRIAL

The case went to trial on March 23, 2001, and lasted two full days. The first person to testify was J.T.S., who denied that he was the father of D.D.V., and voluntarily surrendered any parental rights he might have had. Other possible candidates for fatherhood, M.H. and "Unknown Father of D.D.V.," had been served by publication in conformity with the law, but did not make an appearance. The State called six other witnesses, including M.M.V. The defense called two witnesses, and had M.M.V. recalled to the stand. Some testimony highlights are discussed below.

Patty Graves testified that she had been M.M.V.'s case manager since January of 2000. After reciting a history of the Department's dealings with M.M.V., she was asked whether she believed that it would be in D.D.V.'s best interest for M.M.V.'s parental rights to be terminated. She answered in the affirmative, stating as the basis for her opinion that D.D.V. had been in foster care for such a long time, and that he was fortunate in having been with the same foster parents throughout the entire period. She went on,

"It would appear that these two issues, housing and employment, would not be major or difficult issues to correct. And even though D.D.V. knows who his mother is – and he loves his mother – I think he would need more than unstable housing and some definite stability to provide for him financially."

Ms. Graves expressed doubts that M.M.V. would be able to obtain and maintain stable housing and employment if she were given extra time to do so, basing her opinion entirely upon the fact that she had not succeeded during the three years that D.D.V. was in foster care. In response to cross-examination, she characterized her relationship with M.M.V. as "professional," and stated that "I don't know her personally." She admitted that she had never sat down with M.M.V. to talk to her about her past, and she stated that she had never made a referral to help M.M.V. with housing because she had never been asked.

Although Ms. Graves denied that she had a personality conflict with M.M.V., their relationship can hardly be called warm. Ms. Graves testified as to one disagreement between them. During visitation with D.D.V. under the supervision of Ms. Graves, M.M.V. asked her son questions about his sister's adjustment to the foster home in which they both lived, questions such as whether the other children played with her, and whether she cried at night. Ms. Graves ordered her to stop asking such questions because in her view they were not appropriate, and stated that if M.M.V. had any concerns about the care her daughter was receiving, Ms. Graves "would have been more than

happy to discuss that with her prior to or after the visit." When M.M.V. balked, Ms. Graves said she would end the visit if she did not drop the subject immediately.

The testimony of Lula McClain, who had acted as D.D.V.'s foster mother since he first went into foster care, indicates some possible reasons why M.M.V. might feel concern. Ms. McClain testified that D.D.V. was a very active child, who needed constant attention, and that while he was in her care, he had suffered household accidents which resulted in a black eye, a tooth knocked out, and stitches or staples to close a wound in his head. Ms. McClain also testified that she was taking care of seven foster children under the age of ten, including a twelve-month-old, a fifteen-month-old, and an eighteen-month old. Although she testified that it was apparent that D.D.V. loved his mother, and that his mother loved him, she said that she would be interested in adopting D.D.V. if that ever became possible.

Sherron Foutch testified that she had known M.M.V. since she was pregnant with D.D.V., and that before DCS took custody of the child, D.D.V. always appeared to be clean, well-fed, well-dressed, and well-cared for. She declared that she had no doubts about M.M.V.'s ability to care for her child, and that it would be in D.D.V.'s best interest for them to be reunited.

Ms. Foutch is a disabled forty-year-old woman with no children of her own, who started taking care of her brothers and sisters when she was a young child herself, and has been taking care of children all her life. Ms. Foutch observed that M.M.V. was somewhat immature when they met, and that she had a difficult time dealing with individuals in authority because of her unfortunate experiences as a child in foster care.

After M.M.V. lost custody of D.D.V., Ms. Foutch welcomed her into her home, and the younger woman stayed with her during several intervals over the next few years. A home study of Ms. Foutch's residence by a CASA representative described her as "open, interested and helpful," and her apartment as "neat, clean and orderly," with all unsafe objects locked away or out of the reach of children. On the basis of the study, the court permitted M.M.V. to have supervised visitation with D.D.V. in her apartment.

Ms. Foutch declared that she considered M.M.V. to be both a friend and a part of her family, and the older woman helped her in numerous ways, although she was not able to arrange for food stamps or AFDC for M.M.V., because of the lack of a fixed address. M.M.V. helped look after the children Ms. Foutch was caring for, and according to Ms. Foutch "they just love her." They included Ms. Foutch's grand-niece, with whom M.M.V. had formed a particularly strong bond.

Ms. Foutch testified that she was willing to challenge M.M.V. when she was showing bad judgment, and that she was not afraid to enter into a shouting match with her when she believed M.M.V.'s conduct amounted to "a bonehead stunt." Ms. Foutch also testified that M.M.V. had grown and matured in recent years, and she promised that if M.M.V. were re-united with her son, she was ready and willing to take care of him while M.M.V. worked.

Rondha Charles testified that she had known M.M.V. for about two years. Just before they met, Ms. Charles had left an abusive husband, and she needed someone to watch her two young children while she was at work. M.M.V. offered to help her, and looked after her children for eight or nine hours a day. Ms. Charles stated that M.M.V. was very careful with the children, and that she had no worries about M.M.V.'s ability to keep them safe and healthy.

When M.M.V. came to the stand, she candidly acknowledged that she had made many errors in judgment, and admitted that she was still immature in many respects, but she stoutly defended her attitude towards Ms. Graves, who she claimed did not treat her as one adult should treat another.

M.M.V. described her most recent efforts to become self-sufficient. She testified that she was employed at the University Medical Center in Lebanon, where she was working four twelve hour shifts and one eight hour shift each week. Though her hourly pay was low, she received overtime and a $50 bonus for each twelve hour shift she worked, and she was putting money away in the bank. Because of a general shortage of qualified personnel, she considered her job to be quite secure.

She had also purchased a house trailer with a friend who was receiving disability payments, and had it placed on a piece of land near Hartsville. Though they had not yet moved in, her attorney introduced into evidence photographs of the trailer, a contract with Oakwood Homes for its sale, and an application for its purchase with an income statement on the back. M.M.V. explained that she had not attempted to buy a house trailer earlier, because she just assumed that her purported debt to the public housing authority would have prevented her from getting a bank loan. She had also purchased a car to carry her to and from work.

### C. CLOSING ARGUMENTS AND FINAL ORDER

At the conclusion of the proof, the court heard closing arguments from the State, M.M.V.'s attorney, and D.D.V.'s guardian ad litem. The Department's attorney acknowledged that M.M.V. had made impressive progress toward her goals, but questioned why it had taken her so long. She noted that D.D.V had been in foster care for three and a half years and that most of M.M.V.'s progress had occurred in the few months prior to the termination hearing.

M.M.V.'s attorney delivered an impassioned response, describing the difficulties M.M.V. faced in obtaining housing and steady employment, as an individual without much education or any family support. She also observed that M.M.V.'s pregnancy and the birth of K.V. created additional difficulties for her, but argued that she had made remarkable progress under the circumstances.

The guardian ad litem was reluctant to make an unequivocal recommendation one way or another. He stated that he could not predict whether M.M.V. would succeed in her ambitious plans to raise her children while working full time and relying on the assistance of friends for childcare. He also expressed concerns about D.D.V.'s foster family. He noted that the child needed a lot of

individual attention, and that Ms. McClain, with seven children under the age of ten to take care of, would be hard-pressed to furnish it.

The guardian ad litem further stated that he thought there had been substantial compliance with the parenting plan and that it would be detrimental to D.D.V. to lose his mother. He declared that if the decision were his to make he would "have to think long and hard before I terminated on this," but concluded that "I think the court will make the correct decision," and that "I will sleep okay tonight regardless of what this Court does. I think this child will be cared for."

The judge took the case under advisement, pending receipt of further financial documentation on M.M.V.'s job, and some hard thinking that he acknowledged would be necessary before he could make a decision which he acknowledged "could go either way."

On April 6, 2001, the judge issued his ruling from the bench. Although he conceded that M.M.V. had demonstrated significant improvements in her life, and had taken "tremendous steps" towards reunification with her son, he ruled that it was nonetheless appropriate to terminate her parental rights.

The trial court entered an order terminating M.M.V.'s parental rights, as well as those of J.T.S., M.H., and Unknown Father on May 3, 2001. The court found that M.M.V. had failed to substantially comply with the goals of the permanency plan in a timely manner, that she had failed to remedy the conditions that led both to the child's initial removal from her custody, and his subsequent removal in February of 1999, that the potential for abuse or neglect still remained, that by failing to pay child support for four months, she had statutorily abandoned the child, and that it was in D.D.V.'s best interest that her parental rights be terminated. This appeal followed.

## IV. "REASONABLE EFFORTS"

We must state at the outset that we agree with the trial court that this case presents some difficult facts. It is uncontroverted that M.M.V. has maintained her relationship with her son despite their long separation, and that she is still an important part of his life. She has been quite consistent in matters of visitation, despite the fact that she was effectively homeless for much of the time, and she has complied with most of the requirements the Department has asked her to perform. However, she let years pass before establishing a stable home for herself and her son, and the improvements she has made in her life are so recent that it is difficult to evaluate their permanence.

Parents have a fundamental right to the care, custody and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972). A heightened standard of proof is required to protect those important rights. *Santosky v. Kramer*, 455 U.S. 745 (1982). Before the State may sever the relationship between parent and child it must prove the appropriate grounds by clear and convincing evidence, and must also prove that the termination is in the best interests of the child. Tenn. Code Ann. § 36-1-113.

Even after a child has been validly committed to the custody of the Department of Children's Services, the State's first priority is to restore the family unit if at all possible. *See In Re Drinnon*, 776 S.W.2d 96 (Tenn. Ct. App. 1988). To that end, the Department must submit a written affidavit to the court in each proceeding where the child's placement is at issue, certifying that it has made reasonable efforts to reunify the family. Tenn. Code Ann. § 37-1-166. Section (g)(1) of that statute defines reasonable efforts as "the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family."

It is evident from the record that both the Court and the Department have been very conscientious in monitoring M.M.V.'s progress, and that of her child, and it is well-documented that the primary obstacle to their reunification has always been the lack of stable housing, followed closely by lack of stable employment. However, although the Department has filed five "Affidavit[s] of Reasonable Efforts" with the trial court, there is no evidence that DCS offered her any assistance at all with either of these needs prior to January of 2000, when Ms. Graves became her case manager.

In fact, it appears that DCS made M.M.V.'s housing situation more difficult by deciding that she would have to move out of her two-bedroom apartment if she wished to be re-united with her son. There can be no doubt that the Department is entitled to establish appropriate standards for suitable housing. We believe, however, that when doing so results in the abandonment of a settled residence, the Department is also obligated to make an effort to help its client find new lodging.

The only representative of the Department of Children's Services to testify was Ms. Graves. She admitted that she never made a referral to help M.M.V. obtain housing, but insisted that she told M.V.V. "that if there was anything I could do to help, to let me know and I would do what I could." She also testified that when the subject of housing came up at one point, M.M.V. told her that she could get an apartment. When Ms. Graves was asked if she didn't feel that housing was a problem for M.M.V., she answered "I can't identify problems that are not identified to me," and elsewhere she stated that she thought housing "would not be a major or difficult area to correct."

It is obvious, however, that suitable housing would not be so easy for someone in M.M.V.'s position to acquire without assistance. While her reluctance to ask the Department for help is one of the sources of M.M.V.'s current problems, it appears to us that the social workers at the Department have an obligation to use their superior insight and training to help their clients with the problems the Department itself has identified, even when not specifically asked to do so by the client.

## V. GROUNDS FOR TERMINATION

Statutory grounds for termination are found at Subsection (g) of Tenn. Code Ann. § 36-1-113, and include the following:

> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;

(3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

We will examine these grounds in the order in which they are found in the statute.

## A. ABANDONMENT

Tenn. Code Ann. § 36-1-102 defines abandonment as willful failure to visit the child or willful failure to support or make reasonable payments toward the support of the child for a period of four consecutive months immediately preceding the filing of a pleading to terminate parental rights. Visitation was not an issue in this case, but the trial court found that M.M.V had abandoned her child by failing to pay more than token support during the four months preceding the filing of the petition.

The proof shows that while the Department included a child support obligation in its plan of care from the very beginning, almost no emphasis was placed on this portion of the plan, and the Department always considered the acquisition of housing more crucial. Patty Graves testified that M.M.V. had paid a total of $138 in child support, and that her last payment was made on June 21, 2000. Other parts of the record showed that her total payments amounted to about $200, and that M.M.V.'s total income for the three years preceding trial was about $6,000.

We note that Tenn. Code Ann. § 36-1-102 defines willful failure to support as either a failure to pay any support whatsoever, or a failure to pay more than token support. Token support is defined as support which, "under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B).

We believe that under the unusual circumstances of this case, M.M.V.'s failure to pay child support cannot be considered willful, nor can the support she paid be considered insignificant, given her limited means, her basic living expenses, the stringent housing requirements placed upon her by the Department, and the scanty assistance it provided her.

## B. THE PERMANENCY PLAN

The proof showed that prior to the filing of the petition to terminate her parental rights, M.M.V. complied with almost all the plan requirements set by the Department, except for the establishment of a stable home. She consistently visited her son, followed through with anger management and parenting classes, attended a psychological evaluation, passed all her drug tests, and abstained from criminal activity. Although she did not achieve the goal of working at the same job for six months, she did work at a number of jobs, and she managed to enhance her job skills and her earning potential.

The trial court apparently based its finding that M.M.V. had not complied with the Department's plan primarily upon her failure to establish a home that was satisfactory to the Department. We have found that the Department did not make reasonable efforts to help her meet this requirement, so we cannot place the blame for this failure entirely upon her. Also, since M.M.V. had apparently acquired a residence in her own name by the time of trial (though no home study of that residence has yet been performed) we cannot say that this ground has been established by clear and convincing evidence

## C. FAILURE TO REMEDY

D.D.V. was first taken away from his mother because of concern about possible abuse. The Department later determined that there had been no abuse, but decided that he could not be returned to his mother because of the possibility of neglect. M.M.V.'s attorney argued that three trips to the emergency room which resulted in no necessary medical treatment were evidence of neither abuse nor neglect, but rather of an overly protective mother.

Regardless of the validity of the reason D.D.V. was removed from his mother's home, it appears to us that the condition that chiefly prevented his return was the lack of suitable housing. M.M.V. presented evidence at trial that she had purchased a trailer for use as a residence, and placed it upon a piece of rural land. Thus, we cannot say that it has been established by clear and convincing evidence that the condition preventing the reunion between mother and child had not been remedied, or that there is little likelihood that it will be remedied at an early date.

## V. CONCLUSION

While both parties have provided extensive argument as to the best interests of D.D.V., this factor only comes into play if the grounds for termination of parental rights have been proven by clear and convincing evidence. Since we have not found that any such grounds have been proven, it is really not necessary for us to decide if D.D.V. would be better off in the custody of his mother or of someone else. We must observe, however, that we do not believe that the proof in the record

supports a finding that it would be in D.D.V.'s best interests that his mother's parental rights be terminated.

We do not wish to minimize the difficulties that M.M.V. is bound to encounter as a single working mother, and we cannot predict any better than the trial court can whether she will succeed in overcoming those difficulties. It is obvious that if her child is returned to her, she will not be able to keep working so many hours at her job, and that she will have to rely on a network of friends who are willing to help her with daycare and other matters. But these are not reasons for terminating a parent's rights, or for denying custody.

M.M.V.'s attorney points out to us that petitioners for adoption of a child are considered financially able if they can ensure that any physical, emotional, or special needs of the child are met "by use of any and all income and economic resources of the petitioners, including, but not limited to, assistance from public or private sources." Tenn. Code Ann. § 36-1-102(19). She argues that if adoptive parents can rely on such sources, it would be wrong to disqualify a biological parent from the care of her child simply because of a similar reliance. We agree.

We reverse the order of the trial court terminating the parental rights of M.M.V. We note, however, that our decision does not operate to remove custody of D.D.V. from the State of Tennessee or from his foster family. A change of custody will require further court proceedings, and further proof as to the improvements in M.M.V.'s situation.

## VI.

The judgment of the trial court is affirmed in regard to the termination of the parental rights of J.T.S., M.H., and Unknown Father of D.D.V., but reversed in regard to the termination of the parental rights of M.M.V. Remand this cause to the Juvenile Court of Wilson County for further proceedings consistent with this opinion. Tax the costs on appeal to the State of Tennessee.

_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.